## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BRIGHTSTAR FRANCHISING, LLC,

Plaintiff,

v.

FORESIDE MANAGEMENT
COMPANY, MARK E. WOODSUM,
and CLAIRE WOODSUM,

Defendants.

Case No. 1:25-cv-08741

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff BrightStar Franchising, LLC ("BrightStar") filed this lawsuit against Foreside Management Company ("Foreside"), Mark Woodsum, and Claire Woodsum (collectively, "Defendants") alleging two counts of breach of contract. BrightStar has moved for a preliminary injunction [13]. For the reasons explained below, BrightStar's motion for a preliminary injunction [13] is granted in part.

### I.  Background

The facts herein are taken from BrightStar's Complaint [1], motion for preliminary injunction [13], reply brief [36], Defendants' response brief [32], and the exhibits, declarations, memorandums, and evidentiary objections accompanying those filings. The Court makes "factual determinations on the basis of a fair interpretation of the evidence before the court." *Darryl H. v. Coler*, 801 F.2d 893, 898 (7th Cir. 1986). Yet these findings are preliminary and "do not bind the district court

1

as the case progresses." *Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011).[1]

BrightStar is the franchisor for BrightStar Care® Agencies, which provide in-home care services in defined territories using proprietary systems that BrightStar has developed, honed, and improved on since its founding in 2005. [35-1] (Amended Declaration of Zack Woods, "Woods Amd. Decl.") ¶ 7. BrightStar is the exclusive owner of its proprietary systems and, pursuant to written franchise agreements, grants its franchisees licenses to use those systems subject to the terms of their respective franchise agreements. *Id.* ¶ 8.

Foreside is a former franchisee of BrightStar that provides a variety of in-home care and facility staffing services throughout Southern California. [32-1] (Declaration of Mark Woodsum, "Woodsum Decl.") ¶ 2. Mark Woodsum incorporated Foreside in 2014 and has been its Chief Executive Officer ("CEO") since its inception. *Id.* ¶ 1. Claire Woodsum is his wife. *Id.* ¶ 3.

Over the course of 2014 and 2015, Mark Woodsum entered into four franchise agreements with BrightStar. Woods Amd. Decl., Exs. 1–4 (collectively, the "Franchise

---

[1] Defendants' evidentiary objections [32-3] to BrightStar's declarations in support of the preliminary injunction are overruled. BrightStar relies on a declaration and an amended declaration from BrightStar's Chief Operating Officer, Zach Woods. Defendants' objections are for lack of foundation, speculation, vagueness, and hearsay. The Court has reviewed Zach Woods' amended declaration. The objected to statements contain a proper foundation and are not speculative. *See e.g.* [35-1] ¶¶ 10, 22, 27, 29, 30. In addition, courts rely on relaxed evidentiary standards during preliminary injunction proceedings. *City of Evanston v. N. Illinois Gas Co.*, 381 F. Supp. 3d 941, 948 (N.D. Ill. 2019) ("evidentiary rules are relaxed at the preliminary injunction stage.").

Agreements"). The Franchise Agreements were drafted by BrightStar. Woodsum Decl. ¶ 5. Sections 11 and 14 of the Franchise Agreements contain obligations that a franchisee is obliged to follow should the Franchise Agreements terminate. Franchise Agreements §§ 11, 14. These include, among other things, restraints on the franchisee's ability to compete against BrightStar in certain geographic regions for 18 months, *id*. § 11.4, restraints on the franchisee's ability to solicit BrightStar's customers for 18 months, *id*., and obligations to transfer telephone numbers in connection with the franchisee's business. *Id*. § 14.1.5. Section 15 of the Franchise Agreements includes a dispute resolution protocol that governs how certain types of disputes between BrightStar and the franchisee should be handled. *Id*. § 15.

Mark Woodsum later assigned the Franchise Agreements to Foreside. Woodsum Decl. ¶ 5. Claire Woodsum was not a party to the Franchise Agreements except that she signed a spousal consent to be bound by Sections 11 and 14. *Id*.

After entering into the Franchise Agreements, Defendants began operating BrightStar franchise agencies out of two offices, one located in Newport Beach, California (the "Newport Beach Office") and the other located in Mission Viejo, California (the "Mission Viejo Office"). Woods Amd. Decl. ¶ 16. The listed landlord for the Newport Beach Office is a third-party called 1200 Quail Street LLC, acting through an entity called D. Wong & Associates, LLC. *Id*. ¶ 17. Foreside is its own landlord for the Mission Viejo Office. *Id*. Foreside later executed a Collateral Assignment of Lease for each office's lease. *Id*., Exs. 5–6 (collectively, the "Collateral Lease Assignments"). The Collateral Lease Assignments provide that, "upon

expiration or termination of the Franchise Agreement," BrightStar "will have the right and is hereby empowered to take possession of the Premises, expel [Foreside] therefrom, and, in such event, [Foreside] will have no further right, title or interest in the Lease." *Id.*, Ex. 5 at Exhibit E-1; *id.*, Ex. 6 at Exhibit I-1.

As the Franchise Agreements neared expiration, Mark Woodsum informed BrightStar's CEO, Andrew Ray, that Foreside did not intend to renew the Franchise Agreements. Woodsum Decl.¶ 8; Woods Amd. Decl. ¶ 20. On July 26, 2025, the Franchise Agreements expired, and Foreside began operating outside of BrightStar's franchise network. Woodsum Decl.¶ 9. BrightStar filed this action two days later, seeking specific performance of the Collateral Lease Assignments and to enforce the post-termination obligations in Sections 11 and 14 of the Franchise Agreements. [1].

On August 4, 2024, BrightStar filed this instant motion for preliminary injunction. [13]. Like BrightStar's Complaint, BrightStar's motion seeks to compel immediate possession of the Newport Beach and Mission Viejo Offices under the Collateral Lease Assignments and enforce the post termination obligations in the Franchise Agreements.

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). *See also Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020) ("a preliminary injunction is an exercise of a very far-reaching power, never to be indulged [] except in a case clearly demanding it.") (cleaned up).

The party seeking a preliminary injunction must make an initial threshold showing that: (1) it has a likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the injunction is not granted; and (3) traditional legal remedies would be inadequate. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). *See also Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). Demonstrating a likelihood of success is "a significant burden," though "at such a preliminary stage, the applicant need not show that it definitely will win the case." *Id.* (noting that the "better than negligible" standard has been retired). Nevertheless, "although the party seeking the injunction need not demonstrate likelihood of success by a preponderance of the evidence, that party must nevertheless make a 'strong' showing." *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Illinois Republican Party*, 973 F.3d at 763). If the moving party fails to demonstrate "any one of the[] three threshold requirements, [the court] must deny the injunction." *Girl Scouts of Manitou,* 549 F.3d at 1086.

If the moving party makes the initial showing, the court then balances the irreparable harm that the moving party would endure without a preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief. *Id.* "This Circuit employs a sliding scale approach for this balancing: if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor." *GEFT Outdoors, LLC v. City of*

*Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (internal citation and quotations omitted). Finally, the court asks "whether the preliminary injunction is in the public interest, which entails taking into account any effects on non-parties." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). "Ultimately, the moving party bears the burden of showing that a preliminary injunction is warranted." *Id.*

### III.   Analysis

As an initial matter, BrightStar and Defendants disagree about whether this Court should apply Illinois or California law when evaluating the restraints on competition found in the Franchise Agreements.

#### A. Choice-of-Law

Federal Courts exercising diversity jurisdiction apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Illinois follows the Second Restatement of Conflict of Laws, and will generally honor the choice-of-law provisions in a contract unless: "(1) the chosen state has no substantial relationship to the parties or the transaction; or (2) application of the chosen law would be contrary to a fundamental public policy of a state with a materially greater interest in the issue in dispute." *Brown & Brown, Inc. v. Mudron*, 379 Ill. App. 3d 724, 887 N.E.2d 437, 439–40 (2008) (paraphrasing the Second Restatement of Conflict of Laws, § 187). *See also Int'l Surplus Lines Ins. Co. v. Pioneer Life Ins. Co. of Illinois,* 209 Ill. App. 3d 144, 568 N.E.2d 9, 14 (1990) (when "the contract contains a choice of law provision, section 187 of the Restatement applies."); *Morris B. Chapman & Assocs., Ltd. v. Kitzman,* 193 Ill. 2d 560, 739 N.E.2d 1263, 1269 (2000)

("Illinois follows the Restatement (Second) of Conflict of Laws (1971) in making choice-of-law decisions."); *Hendricks v. Novae Corporate Underwriting, Ltd.*, 868 F.3d 542, 545 (7th Cir. 2017).

Here, the Franchise Agreements contain an Illinois choice-of-law provision. Defendants challenge the application of Illinois law, asserting California law should apply. Defendants thus bear the burden of demonstrating that a true conflict of laws exists. *MiMedx Group, Inc. v. Fox, No.* 16 CV 11715, 2017 WL 3278913, at *2 (N.D. Ill. Aug. 2, 2017) (the party arguing for departure from choice-of-law provision in contract "bears the burden of demonstrating a conflict, i.e., that there exists a difference in the law that will make a difference in the outcome.") (quoting *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 2014 IL 116389, ¶ 14 (2014)); *see also Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 879 N.E.2d 893, 898 (2007) ("[a] choice-of-law determination is required only when a difference in law will make a difference in the outcome.").

Defendants argue that the restraints on competition in the Franchise Agreements—which have a direct bearing on BrightStar's likelihood of success on the merits—are unenforceable under California law. They specifically assert that § 16600 of the California Business Code ("Section 16600") per se invalidates such restraints. Cal. Bus & Prof. Code § 16600. BrightStar disagrees, contending that in *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130 (2020) the California Supreme Court held that Section 16600 does not per se invalidate such restraints so long as they were made in the context of a commercial relationship. Instead, a reasonableness

standard applies. Therefore, to determine whether a conflict of laws exists, the Court must examine *Ixchel*.

### i. Ixchel

Section 16600[2] reads as follows:

> (a) Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.

Cal. Bus. & Prof. Code § 16600.

Prior to *Ixchel*, lower courts in California may have read this language to restrict covenants not to compete made in the commercial context. In *Ixchel*, the California Supreme Court clarified this confusion. The California Supreme Court reaffirmed that contractual restrictions in which an employer attempts to restrain a former employee's ability to engage in her profession, trade, or business are per se invalid under Section 16600 unless an enumerated exceptions applies. *Id*. at 1157–59. However, the California Supreme Court found that this per se invalidity did not extend to contractual restraints on "business operations and commercial dealings." *Id* at 1159. Contractual restraints between businesses are instead subject to "a reasonableness standard." *Id*.

The parties do not dispute the core holding of *Ixchel*. The disagreement rather is whether the relationship between BrightStar and Defendants was indeed a business relationship that falls within *Ixchel*'s "reasonableness standard." BrightStar

---

[2] Section 16600 was amended post-*Ixchel* to include a subsection (b) and (c). The parties do not contend that those amendments affect the analysis.

contends that franchise relationships are business relationships. Defendants argue that Foreside was an independent contractor and thus the BrightStar–Foreside relationship must be viewed as an employment relationship upon which Section 16600's per se rule still applies.

The Court need not look further than *Ixchel* itself to resolve this dispute. *Ixchel* specifically references franchise agreements as types of agreements that Section 16600 does not automatically invalidate "simply because they restrain trade in some way." *Id.* at 1161. While this alone resolves the parties' disagreement, the Court is also persuaded that franchise agreements are business arrangements—and a franchisee does not have an employment relationship with the franchisor—based on relevant statutory definitions found in Illinois and California law. 815 ILCS 705/3(1) (the Illinois Franchise Disclosure Act defining "Franchise" as an agreement where "a franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services."); Cal. Bus. & Prof. Code § 20001 (California's Franchise Relations Act defining "Franchise" similarly). Though the Franchise Agreements here do refer to "independent contractor" in Section 19, the Court agrees with BrightStar that that reference was to ensure that under agency principles, a franchisee cannot bind BrightStar to contracts. It is a far stretch to say that Section 19's single "independent contractor" reference shifts the entire BrightStar–Foreside relationship into an employment context. The BrightStar–Foreside relationship was a business relationship. *Ixchel*'s "reasonableness standard" therefore applies.

### ii. Post-Termination Covenants

To avoid the effect of *Ixchel*, Defendants contend that *Ixchel*'s holding is strictly confined to ongoing commercial dealings or business operations (*i.e.*, in-term covenants) and does not apply to post-termination covenants. As a result, the argument goes, post-termination covenants like those found in the Franchise Agreements are still per se invalid under Section 16600.

It is true that *Ixchel* did not involve post-termination covenants. But nothing in *Ixchel* suggests that its reasoning would not apply to post-termination covenants made in the commercial context. Defendants have not identified any post-*Ixchel* authority suggesting that *Ixchel* is so limited. By contrast, BrightStar identifies several federal district court[3] decisions indicating that *Ixchel* applies to post-termination covenants. *Vanguard Logistics Services (USA) Inc. v. Groupage Services. of New England, LLC*, No. CV180517DSFGJSX, 2022 WL 1601389, at *11 (C.D. Cal. Feb. 8, 2022) ("the Court disagrees with Defendants that *Ixchel* mandates that post-termination non-compete agreements are unenforceable."); *OWLink Technology, Inc. v. Cypress Technology Co.*, No. 221CV00717SPGKES, 2023 WL 4291978, at *3 (C.D. Cal. Jan. 23, 2023) (noting "post-termination restrictions on trade are not per se invalid" and applying the rule of reason); *Postnet International Franchise Corporation. v. Wu*, 521 F. Supp. 3d 1087, 1101 (D. Colo. 2021) (in the context of a post-termination covenant, noting that "[w]hile [*Ixchel*] did not explicitly address

---

[3] BrightStar does provide one decision from the California Court of Appeals: *GreenLink Financial, LLC v. Freedom Debt Relief, LLC*, 2022 WL 780655 (Cal. Ct. App. Mar. 15, 2022). That decision is unpublished. Under California Rule of Court 8.1115, a court cannot rely on unpublished opinions. Cal. R. Ct. 8.1115. This Court thus gives no weight to the *GreenLink* opinion.

covenants not to compete, such covenants are 'business dealings' evaluated under the rule of reason analysis.").

The parties provide no California Supreme Court or Appellate Court decisions directly addressing this issue. Nor has the Court identified any. In such an absence, it is this Court's task to predict how the California Supreme Court would rule on this issue. *In re Zimmer, NexGen Knee Implant Prods. Liability Litigation*, 884 F.3d 746, 751 (7th Cir. 2018). Where there is no state supreme or appellate court authority on point, relying on "reasoning from what state or federal courts in other jurisdictions have done is acceptable." *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1092 (7th Cir. 1999). The Court therefore follows the trend laid out by the federal district courts in *Vanguard, OWLink Technology,* and *Postnet* and finds that *Ixchel* extends to post-termination covenants in the commercial context.

### iii. Rule of Reason

To summarize so far: (1) *Ixchel* confirms that Section 16600 does not per se invalidate commercial contracts but instead the rule of reason applies, (2) the Franchise Agreements are commercial contracts subject to the rule of reason, and (3) *Ixchel* extends to post-termination covenants such as those found in the Franchise Agreements. The Court now returns to the conflict of laws issue. To reiterate the standard: a party asking for a departure from a choice-of-law provision (here, Defendants) must demonstrate a difference in the law that will make a difference in the outcome. *MiMedx Group, Inc.*, 2017 WL 3278913, at *2. Defendants must therefore show that application of California's rule of reason to the restraints on

11

competition would result in a different outcome than application of Illinois' reasonableness standard. Defendants, however, have not provided such analysis. Indeed, while Defendants spend a paragraph discussing application of *California's* rule of reason to the restraints on competition, they provide no analysis on how application of California's reasonableness standard would differ from application of Illinois' reasonableness standard. This Court will not perform that analysis for Defendants. *Pouncy v. City of Chicago*, No. 15-CV-1840, 2017 WL 8205488, at *14 n. 11 (N.D. Ill. Dec. 11, 2017) ("it is not the duty of the court to make parties' arguments for them.").

Defendants have not met their burden of demonstrating an actual conflict of laws that will make a difference in the outcome. The Court therefore applies the choice-of-law provision in the Franchise Agreements and proceeds under Illinois law.

### B. Preliminary Injunction

Having determined that Illinois law applies to the Franchise Agreements, the Court now addresses the merits of BrightStar's motion for preliminary injunction.

### i. Likelihood of Success on the Merits

To prevail on a motion for preliminary injunction, a plaintiff must show that it has a "strong" chance of success on the merits of at least one of its claims. *Illinois Republican Party*, 973 F.3d 763. Both of BrightStar's claims are for breach of contract. To prevail on such claims under Illinois law, BrightStar must demonstrate that: (1) a valid and enforceable contract exists, (2) it substantially performed the contract, (3) Defendants breached the contract, and (4) injuries resulted from the breach. *Swyear*

*v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018). The Court addresses each of these elements in turn.

### 1. Valid and Enforceable Contract

#### a. Collateral Lease Assignments

The validity and enforceability of the Collateral Assignment of Lease for the Newport Beach Office ("Newport Beach Agreement") is undisputed. Defendants, however, disagree on the enforceability of the Collateral Assignment of Lease for the Mission Viejo Office ("Mission Viejo Agreement"). Defendants contend that because Foreside is its own landlord for the Mission Viejo Office, the Mission Viejo Office lease is void as an entity cannot contract with itself. So, the argument goes, the lease assignment in the Mission Viejo Agreement is unenforceable as there is nothing that can be assigned to BrightStar.

Defendants have a point. In Illinois[4], a party is unable to contract with itself. *Nelson v. Hayner*, 66 Ill. 487, 493 (1873) ("[t]o say that a man entered into a contract of sale with himself, or made a sale of property to himself, is to utter a legal solecism."). Such contracts are void. *Id*. Additionally, for an assignment to be valid in Illinois, the assignor must actually or potentially possess the thing being assigned. *A.J. Maggio Co. v. Willis*, 316 Ill. App. 3d 1043, 738 N.E.2d 592, 596 (2000). If the

---

[4] While the parties debate the choice-of-law issue for the Franchise Agreements, no party has raised a choice-of-law issue with respect to the Collateral Lease Assignments. The Court therefore applies Illinois law to its analysis. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) ("When no party raises the choice of law issue, the federal court may simply apply the forum state's substantive law.").

assignor does not possess the thing being assigned, the assignment is void. *Owens v. McDermott, Will & Emery,* 316 Ill. App. 3d 340, 736 N.E.2d 145, 155 (2000). Here, the underlying Mission Viejo Office lease is void because Foreside was unable to make a lease with itself. This in turn means the assignment of Mission Viejo Office lease was void as Foreside never possessed a lease to assign to BrightStar.

Citing *Steel City Nat'l Bank v. J.J. Wright Oldsmobile, Inc.*, 192 Ill. App. 3d 926 (1989), BrightStar nevertheless contends that Foreside should be equitably estopped from disclaiming their obligations to assign the Mission Viejo Office lease. *Steel City*, however, does not exactly mirror the situation here and it is unclear whether equitable estoppel trumps the principles above under Illinois law. The Court need not decide this question today. Even if equitable estoppel applies, BrightStar has not provided sufficient evidence supporting its application. To establish equitable estoppel in Illinois, the party claiming estoppel must demonstrate the other party (1) made material misrepresentations, (2) knowing they were false, (3) intending reliance by the claiming party, who (4) did not know the representations were untrue, (5) reasonably relied in good faith on the misrepresentations to its detriment, (5) and (6) would be prejudiced if the other party now denies the truth. *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 751 N.E.2d 1150, 1157 (2001). At a minimum, BrightStar has not sufficiently demonstrated that Foreside knew the representations it made to BrightStar were untrue.

In sum, BrightStar has demonstrated a strong likelihood that the Newport Beach Agreement is a valid and enforceable contract. BrightStar has not demonstrated a

strong likelihood that the lease assignment[5] in the Mission Viejo Agreement is enforceable.

### b. Franchise Agreements

There is no dispute that the Franchise Agreements are valid. Rather, the central question is whether the restrictive covenants in the Franchise Agreements are enforceable.

In Illinois, a restrictive covenant is enforceable if it is reasonably necessary to protect the plaintiff's legitimate business interests and reasonably limited in geographic scope and duration. *Verda Indus., Inc. v. Lightning Deterrent Corp.*, No. 94 C 1693, 1995 WL 548610, at *4 (N.D. Ill. Sept. 13, 1995) (collecting cases). Here, BrightStar claims a business interest in its goodwill, clientele, and confidential information. These interests are legitimate: BrightStar has expended resources and time in developing its proprietary home care system, relationships, and brand. Woods Amd. Decl. ¶¶ 7–10; *see also Oliveira-Brooks v. Re/Max Int'l, Inc.*, 372 Ill. App. 3d 127, 865 N.E.2d 252, 258 (2007) ("inherent in any franchise is the need to protect the name, goodwill, [and] reputation."). The restrictions in Section 11 of the Franchise Agreements are reasonable tools to protect these interests. *My Favorite Muffin, Too, Inc. v. Wu*, No. 00 C 7820, 2002 WL 826483, at *4 (N.D. Ill. Apr. 30, 2002) (a "covenant not to compete is reasonable to protect [the franchisor's] clientele and its confidential

---

[5] To be sure, other parts of the Mission Viejo Agreement, such as the representations and warranties, may still be enforceable. *Stevens v. Rooks Pitts & Poust*, 289 Ill. App. 3d 991, 682 N.E.2d 1125, 1132 (1997) ("if the legal portion of a bilateral contract is severable… the legal part may be enforced.") (citation omitted). But what BrightStar seeks in Count II is possession.

information."); *Curves Int'l, Inc. v. Szostek,* No. 11 CV 1645, 2011 U.S. Dist. LEXIS 158136, at *4-5 (N.D. Ill. June 2, 2011) ("[e]nforcing the Non-Compete protects the integrity of [the franchisor's] franchise system."); *O.V. Marketing Assocs., Inc. v. Carter*, 766 F. Supp. 960, 966 (D.Kan.1991) ("Courts have recognized certain interests attendant to a franchise that are protectible by restrictive covenants, such as good will [and] trade secrets"). These restrictions are also reasonable in geographic scope and duration. BrightStar only seeks to prevent Defendants from operating at Defendants' former franchise location, in the "protected territory" of Defendants' former franchise, or within 25 miles of any other franchised or company-owned BrightStar. Franchise Agreements § 11.4. The "protected territory" is reasonably limited to zip codes in the area that Defendants' former franchise operated. Franchise Agreements § 1.2; *id.* Ex. A; *see also Brightstar Franchising, LLC v. N. Nevada Care, Inc.*, No. 17 C 9213, 2018 WL 4224454, at *13 (N.D. Ill. Sept. 4, 2018) (issuing a preliminary injunction based on a similar zip-code based restriction). The 25-mile radius is also sensible as BrightStar generally serves clients within a 25-mile radius of its franchise locations. Woods Amd. Decl. ¶ 29; *see also Liautaud v. Liautaud*, 221 F.3d 981, 988 (7th Cir. 2000) ("Generally, courts will uphold a restriction on competition that is coextensive with the area where the promisee is doing business."). The 18-month duration is likewise reasonable as that is the minimum time necessary for the advantages Defendants gained operating as franchisees to dissipate, for BrightStar to identify a new franchisee, and for the new franchisee to start operations. Woods Amd. Decl. ¶ 29. The Franchise Agreements' other post-

termination provisions, including the obligations to transfer telephone numbers,[6] are similarly reasonable. *BrightStar Franchising, LLC*, 2018 WL 4224454, at *13 (ordering a former franchisee to assign telephone numbers).

Defendants do not challenge the reasonableness of the restrictive covenants under Illinois law. They instead contend that, under application of California law, such restraints are per se invalid or alternatively fail California's rule of reason. But because Illinois law applies (and because, post-*Ixchel*, even California law does not per se invalidate post-termination covenants made in commercial contexts), Defendants' arguments are inapplicable. BrightStar has thus demonstrated a strong likelihood that the Franchise Agreements are valid and enforceable contracts.

## 2. Substantial Performance

The parties do not dispute BrightStar's performance under the Collateral Lease Assignments. The parties do, however, disagree on whether BrightStar substantially performed its obligations under the Franchise Agreements. "A party who has materially breached a contract has not substantially performed." *FW Assocs. LLC v. WM Assocs. LLC*, No. 18 C 5081, 2019 WL 354953, at *5 (N.D. Ill. Jan. 28, 2019). Defendants argue that BrightStar's failure to comply with the pre-dispute obligations in Section 15 of the Franchise Agreements constitutes a material breach. BrightStar argues, among other things, that those pre-dispute obligations are inapplicable to this lawsuit. The Court agrees with BrightStar: actions for injunctive relief are explicitly

---

[6] The Court notes that it is unclear, under Illinois law, whether these provisions would even be considered "restrictive covenants" that are subject to reasonableness limitations.

carved out of the mandatory[7] pre-dispute obligations set forth in Section 15 of the Franchise Agreements. Franchise Agreements §§ 15.2–15.4. The Court therefore finds a strong likelihood that this element will be met for the Collateral Lease Assignments and Franchise Agreements.

### 3. Breach of Contract

Though Defendants challenge the enforceability of the lease assignment in the Mission Viejo Agreement, they do not dispute that they are in breach that agreement by failing to vacate the Mission Viejo Office. *Aon plc v. Alpine Rewards, LLC*, No. 22-CV-4762, 2023 WL 3713987, at *8 (N.D. Ill. Apr. 12, 2023) ("enforceability of contractual provisions is one thing. A breach is another."). And while Defendants may have previously been in breach of the Newport Beach Agreement for failure to vacate, it is undisputed that Defendants cured that breach by vacating and surrendering the Newport Beach Office. Woodsum Decl. ¶ 13.

Conversely, whether Defendants breached the Franchise Agreements is vigorously debated. BrightStar argues Defendants breached several post-termination obligations in the Franchise Agreements. Defendants contend they did not. The Court addresses each alleged breach in turn.

### a. Use of Confidential Information (§ 11.3)

BrightStar alleges Defendants are in breach of Section 11.3 by continuing to use BrightStar's confidential information, including BrightStar's customer information. BrightStar provides statements from Zack Woods, Woods Amd. Decl. ¶¶

---

[7] Providing written notice is not mandatory. *See* Section 15.1.

21, 26; [37] (Supplemental Declaration of Zack Woods, "Woods Supp. Decl.") ¶ 10, and communications where Foreside admits that everything with Foreside would remain the same after termination of the Franchise Agreements in support. *Id.*, Exs. 8–9. Defendants do not explicitly deny using BrightStar's confidential information, contending only that they have not used such information "for any forbidden purpose." Woodsum Decl. ¶ 11. What that means is unclear. But what is clear is that Section 11.3 states that BrightStar's confidential information cannot be used for "any purpose except to operate the Agency." Franchise Agreements § 11.3. That means there is no purpose which Defendants are permitted use BrightStar's confidential information. Defendants also do not deny using BrightStar's customer information, which BrightStar considers confidential. They instead assert that BrightStar's customers are generally known to the public. Woodsum Decl. ¶ 10. Defendants fail to explain how this excuses their use of BrightStar's customer information. That a customer is known to the public via a business directory would not excuse, for instance, use of business terms in confidential agreements that BrightStar entered into with that customer. Moreover, it is difficult to fathom that after 10 years as a BrightStar franchisee, Defendants have ceased using any BrightStar confidential information, especially where Defendants advertised that everything would remain the same after termination of the Franchise Agreements. Balancing the evidence presented, the Court finds a strong likelihood that BrightStar will be able to establish breach of Section 11.3.

b. <u>Non-Compete Covenants (§ 11.4)</u>

BrightStar alleges Defendants are in breach of Section 11.4 by operating a competing business within a prohibited geographic area and by soliciting business from customers of Defendants' former BrightStar agency. BrightStar provides unrebutted evidence in support. Woods Amd. Decl. ¶¶ 21–28; Woods Supp. Decl. ¶ 10. Though Defendants do not dispute their breach they again argue that the covenants in Section 11.4 are unenforceable under California law. But because Illinois law applies, Defendants' argument is once more inapplicable. The Court finds a strong likelihood that BrightStar will be able to establish breach of Section 11.4.

### c. Connections to BrightStar (§ 14.1.1)

BrightStar alleges Defendants are in breach of Section 14.1.1 by holding themselves out as a former BrightStar franchisee. In support, BrightStar provides a September 11, 2025 communication in which Foreside identifies itself as a former BrightStar franchisee. Woods Supp. Decl., Ex. 2. ("After 10 years as a locally owned and operated BrightStar Care franchise agency…"). Defendants' only rebuttal evidence is a statement from Mark Woodsum that "Foreside is not currently holding itself out as a former BrightStar Care franchisee and will not do so in the future." Woodsum Decl. ¶ 12. That statement is directly contradicted by the aforementioned communication. Balancing the evidence presented, the Court finds a strong likelihood that BrightStar will be able to establish breach of Section 14.1.1.

### d. Return of Confidential Information (§ 14.1.4)

BrightStar alleges Defendants are in breach of Section 14.1.4 by failing to return BrightStar's confidential materials and other property. Though Defendants present

evidence they deleted all BrightStar-owned materials such as the Operational Manual, they do not deny their use—and thus current possession—of BrightStar's confidential customer information, Woodsum Decl. ¶¶ 10–11, and components of the BrightStar Agency Program. *See infra*. Balancing the evidence presented, the Court finds a strong likelihood that BrightStar will be able to establish breach of Section 14.1.4.

### e. Use of Telephone Numbers (§ 14.1.5)

BrightStar alleges Defendants are in breach of Section 14.1.5 by failing to transfer to BrightStar telephone numbers Defendants used in connection with their franchisee operations. BrightStar provides unrebutted evidence in support. Woods Amd. Decl. ¶ 21; Woods Supp. Decl. ¶ 10. The Court finds a strong likelihood that BrightStar will be able to establish breach of Section 14.1.5.

### f. Providing Contacts and Obligations (§ 14.1.6)

BrightStar alleges Defendants are in breach of Section 14.1.6 by failing to provide to BrightStar a list of Foreside's employees, clients, and contacts as well as outstanding obligations Foreside has to third parties. While Defendants submit evidence that they have provided BrightStar a list of clients, employees, and contacts, Woodsum Decl. ¶ 14, they do not deny that they have not provided Foreside's outstanding obligations to third parties. BrightStar, however, appears to have dropped its pursuit of these outstanding obligations. Woods Amd. Decl. ¶ 21. To the extent it has not, the Court finds a strong likelihood that BrightStar will be able to

establish breach of Section 14.1.6. The Court will address Defendants' actions of providing the list of clients, employees, and contacts below.

### g. Cease Using BrightStar's Program (§ 14.1.7)

BrightStar alleges Defendants are in breach of Section 14.1.7 by continuing to use components of the BrightStar Agency Program. In support, BrightStar provides statements from Zack Woods, Woods Decl. ¶¶ 21, 23, 25–26, and the same communications where Foreside advertised that everything with Foreside would remain the same after termination of the Franchise Agreements. *Id.*, Exs. 8–9. Defendants do not deny using components of the BrightStar Agency Program, but instead argue that those components are generally known. Woodsum Decl. ¶ 11. Defendants fail to explain how being generally known excuses their breach. Moreover, that BrightStar has grown to over 400 franchise locations over 20 years is an indication that the BrightStar Agency Program is not generally known. Woods Amd. Decl. ¶¶ 7, 9; *see also id.* (explaining that BrightStar has been developing its proprietary systems since 2005). Balancing the evidence presented, the Court finds a strong likelihood that BrightStar will be able to establish breach of Section 14.1.7.

### h. Cease Using BrightStar's Marks (§ 14.1.8)

BrightStar alleges Defendants are in breach of Section 14.1.8 by continuing to use BrightStar's indicia, including by displaying BrightStar signage at the Newport Beach and Mission Viejo Offices. In support, BrightStar provides statements from Zack Woods and Mark Woodsum's September 13, 2025 Facebook cover photo update, which shows him in front of a banner that says "BrighStarCare." Woods Amd. Decl.

¶ 21; Woods Supp. Decl., Ex. 1. Defendants admit that some BrightStar "curb labels" remain at the Mission Viejo Office, though are in the process of being taken down. Woodsum Decl. ¶ 13. Defendants do not deny that BrightStar indicia remains at the Newport Beach Office but explain that they no longer have control of the Newport Beach Office signage as they have surrendered the premise. *Id*. Defendants also submit a statement from Mark Woodsum noting that "Foreside does not currently reference BrightStar in any of its advertising or marketing and will not do so in the future." *Id*. ¶ 12. But the reliability of that statement is suspect given Mark Woodsum's cover photo update. Balancing the evidence presented, the Court finds a strong likelihood that BrightStar will be able to establish breach of Section 14.1.8. The Court will address Defendants' actions to cure that breach below.

### 4. Injury Caused by Breach

BrightStar has clearly demonstrated injuries: their confidential information and goodwill, among other things, are being exploited by Defendants. *See e.g.*, Woods Amd. Decl. ¶¶ 21, 24–26. Defendants do not dispute the merits of BrightStar's injuries and only reiterate their arguments regarding unenforceability and lack of breach. The Court thus finds a strong likelihood that this element will too be met.

To recap: the Court finds a strong likelihood of success on the merits for Count I. However, because BrightStar has not sufficiently demonstrated that the lease assignment in the Mission Viejo Agreement is enforceable and Defendants are not in breach of the Newport Beach Agreement, the Court does not find a strong likelihood of success on the merits for Count II. Failure to prove a likelihood of success on the

merits for Count II means a failure to meet the threshold for a preliminary injunction on that count. The Court therefore will proceed with evaluating the remaining requirements for a preliminary injunction for Count I only.

## IV. Irreparable Harm and Inadequate Remedy at Law

Even with a strong likelihood of success on the merits, a plaintiff "must also demonstrate that irreparable harm is 'likely' if the court denies a motion for preliminary injunction." *Data Mgmt. Ass'n Int'l v. Enter. Warehousing Sols., Inc.*, No. 20 C 04711, 2020 WL 7698368, at *4 (N.D. Ill. Dec. 28, 2020) (citation omitted). "[T]he alleged harm need not be occurring or be certain to occur before a court may grant relief," but "there must be more than a mere possibility that the harm will come to pass." *U.S. Army Corps of Eng'rs*, 667 F.3d at 788. Legal remedies for the harm are inadequate if any award would be "seriously deficient as a remedy for the harm suffered." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Here, BrightStar argues it will suffer irreparable harm in the form of lost customers, proprietary information, and goodwill if Defendants are not enjoined. It also argues its franchise system would suffer. The Court agrees.

The Court starts with the non-compete and non-solicitation provisions in the Franchise Agreements. The Seventh Circuit has characterized violations non-competition clauses as a "canonical form of irreparable harm" making "restrictive covenants prime candidates for injunctive relief." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 666–67 (7th Cir. 2015). This is particularly true here, where it is undisputed that Defendants are operating in Southern California—the same region as their

former BrightStar franchise—and servicing BrightStar's former clientele in that region. *Brightstar Franchising, LLC*, 2018 WL 4224454, at *8 (finding irreparable harm where a former franchisee serviced clients of the franchisor in the franchisee' former region). The degree of damage to BrightStar's business flowing from Defendants' conduct is difficult to determine, and as a result "[i]njunctive relief is therefore the best, and probably the only, adequate remedy." *Turnell*, 796 F.3d at 667; *see also Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005) (in violations of restrictive covenants, "it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'").

Defendants' use of BrightStar's confidential information likewise causes irreparable harm. BrightStar's proprietary systems and client relationships took years to develop and are a key differentiator in BrightStar's business. Woods Amd. Decl. ¶¶ 8, 10. Permitting Defendants to exploit that confidential information for their own growth would thus place BrightStar at a serious competitive disadvantage, the losses from which are intangible. *Huawei Techs. Co. v. Motorola, Inc.*, No. 11-CV-497, 2011 WL 612722, at *10 (N.D. Ill. Feb. 22, 2011) ("courts lack a reasonably precise method of calculating the pecuniary damage a corporation faces for its loss of competitive position sustained by the disclosure of its trade secrets and confidential information."). Moreover, by continuing to associate themselves with BrightStar— including by retaining their BrightStar agency telephone numbers—Defendants are exploiting BrightStar's brand and relationships for their own benefit while weakening BrightStar's control over its goodwill. The ultimate consequences of these

harms are also intangible. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 902 (7th Cir. 2001) ("it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill."). Finally, BrightStar provides evidence that other BrightStar franchisees are watching Foreside's actions and may be emboldened to breach their own franchise agreements if Foreside can do so here without consequence. Woods Amd. Decl. ¶ 24. Thus, the effects in this case can have a wide, indeterminable ripple effect across BrightStar's franchise system. This too demands injunctive relief. *Quizno's Corp. v. Kampendahl*, No. 01 C 6433, 2002 WL 1012997, at *7 (N.D. Ill. May 20, 2002) (finding irreparable harm where conduct threatens the franchisor's franchise system as a whole).

Defendants' only counter is to note that Defendants can pay money damages and to repeat the same points previously argued: that BrightStar cannot be harmed by Defendants' failure to comply with invalid contract provisions and that Defendants have complied with all enforceable contract provisions. For the reasons stated above, the Court has found otherwise. The Court therefore finds that BrightStar has demonstrated irreparable harm and a lack of an adequate remedy at law sufficient to justify a preliminary injunction.

## V. Balance of Harms and the Public Interest

Because BrightStar has made the threshold showing required for a preliminary injunction, the Court must now consider (1) the irreparable harm that BrightStar would endure without the protection of the preliminary injunction against any irreparable harm Defendants would suffer if the Court were to grant the

requested relief, and (2) the effects, if any, a grant or denial of the preliminary injunction would have on public interest. *Turnell*, 796 F.3d at 662. The Court must weigh the balance of potential harms on a "sliding scale" against BrightStar's likelihood of success. *Id*. In other words, the more likely BrightStar is to win, the less the balance of harms must weigh in BrightStar's favor and vice versa. *Id*.

Defendants argue that the harm to them is greater than the harm to BrightStar because Defendants would be functionally unable to operate as a business providing in-home care services in California—thereby putting 400 nurses, caregivers, and administrators out of work—if the preliminary injunction is granted, whereas BrightStar could continue to operate through its other 400 franchisees. Woodsum Decl. ¶¶ 15–16. Defendants' alleged harm, however, is entirely self-inflicted: Defendants brought the harm onto themselves by declining to renew the Franchise Agreements when presented by BrightStar with the opportunity to do so and then failing to adhere to the post-termination requirements under the Franchise Agreements. *Brightstar Franchising, LLC*, 2018 WL 4224454, at *9 (balance of harms favored franchisor where franchisee "elected out of the Franchising Agreement after being placed in default, and further opted to re-brand its business model under a different name … all while violating the terms of the Franchise Agreement."); *MarbleLife, Inc. v. Stone Res., Inc.*, 759 F. Supp. 2d 552, 563 (E.D. Pa. 2010) ("By failing to renew the Agreement and subsequently failing to adhere to the post-termination obligations under the Agreement Defendant brought the difficulties occasioned by the issuance of an injunction upon themselves.") (cleaned up); *Quizno's*,

27

2002 WL 1012997, at *7 ("[c]ourts are generally unsympathetic to franchisees who blatantly disregard covenants not to compete.") (citations omitted). Coupled with the fact that Defendants can resume operations in California in 18 months, the Court assigns little weight to Defendants' harm. By contrast, BrightStar has demonstrated that it would be significantly harmed without the issuance of the preliminary injunction. *See supra*.

The effects on public interest also weigh in favor of granting the preliminary injunction. Plaintiff correctly points out that there is a strong public interest in enforcing valid commercial agreements. *Brown & Brown, Inc. v. Ali,* 494 F. Supp. 2d 943, 955 (N.D. Ill. 2007) ("[c]ourts in this District have recognized that the public interest is served by enforcing valid contracts" and citing cases). This public interest remains true in the non-competition and franchise context. *Quizno's,* 2002 WL 1012997, at *7 (in the franchise context finding "there is a [public] benefit to the enforcement of a valid covenant not to compete and encouraging people to adhere to contractual obligations."); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007) ("issuing the preliminary injunction would hold Defendants to the terms of the bargain they entered into through the franchise agreement. Enforcement of contractual duties is in the public interest."). Defendants do not dispute this public interest objective, but instead counter that there is also a public interest in preventing franchisors from violating pre-dispute resolution clauses in their franchise agreements. Even if true, Defendants' argument is inapplicable here as the Franchise Agreements carve out injunctions from the pre-

dispute resolution requirements. Franchise Agreements §§ 15.2–15.4. Defendants further argue that the preliminary injunction will harm the public by causing a break of continuity of care to Defendants' clients. Woodsum Decl. ¶ 16. But BrightStar has sufficiently shown that that harm would be minimal or non-existent, as other nearby BrightStar locations are currently ready, willing, and able to service those clients with little or no disruption to their care. Woods Amd. Decl. ¶ 30; *see also Brightstar Franchising, LLC*, 2018 WL 4224454 at *9 (no harm to the public where franchisor demonstrated there were "ample providers" in the area that could provide care to the franchisee's clients).

Given BrightStar's strong likelihood of success on the merits of Count I, the "sliding scale" requires the potential harms to weigh heavily against granting the preliminary injunction. *Turnell*, 796 F.3d at 662. The alleged harms to Defendants and the public do not do so here. The equities tip towards BrightStar[8] and in favor of granting the preliminary injunction.

## VI.    Scope of the Injunction

The scope of an injunction is committed to the discretion of the district court. *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 307 (7th Cir. 2010). For the reasons above, the Court will not issue a preliminary injunction for relief based on the allegations in Count II. Further, as Defendants have provided BrightStar a

---

[8] The Court also notes here that even if BrightStar established a likelihood of success on the merits on Count II, the balance of harms would weigh in favor of denying the preliminary injunction on the Mission Viejo Office. It is undisputed that the property is owned by Foreside. Surrendering the lease, rendering BrightStar a tenant of Foreside, would serve only to further acrimony and litigation.

list of clients, employees, and contacts, the Court will not require any conduct in that regard. *Am. Postal Workers Union, O'Hare Midway "T" Loc. 7011 v. Am. Postal Workers Union, AFL-CIO*, 62 F. Supp. 3d 690, 697 (N.D. Ill. 2014) ("a court cannot issue a preliminary injunction if the event the plaintiff wishes to enjoin has already occurred."). The same goes for the signage at the Newport Beach and Mission Viejo offices and the Operations Manual. The Court will conduct a status to discuss the remaining terms of the preliminary injunction and timetable for enforcement.

## VII. Conclusion

For the stated reasons, BrightStar's motion for preliminary injunction [13] is granted-in-part.

E N T E R :

Dated: October 29, 2025

_____
MARY M. ROWLAND
United States District Judge