**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BRIGHTSTAR FRANCHISING, LLC<br><br>Plaintiff,<br><br>v.<br><br>FORESIDE MANAGEMENT COMPANY, MARK E. WOODSUM, and CLAIRE WOODSUM,<br><br>Defendants. | Case No. 1:25-cv-08741<br><br>Judge Mary M. Rowland |

**MEMORANDUM OPINION AND ORDER**

Plaintiff BrightStar Franchising, LLC ("BrightStar" or "Plaintiff"), a home health care franchisor, brought this action in July 2025 seeking a permanent injunction prohibiting Defendants Foreside Management Company ("Foreside"), and its owners, Mark Woodsum ("Mr. Woodsum") and Claire Woodsum ("Mrs. Woodsum") (collectively, "Defendants"), from violating their obligations under their franchise agreements. [1]. The Court previously granted BrightStar's motion for a preliminary injunction [45], entered a Preliminary Injunction Order, [52], granted BrightStar's Motion for Rule to Show Cause why Defendants should not be held in contempt and sanctioned for violations of the Preliminary Injunction Order [67], and appointed a Receiver to ensure Defendants' compliance. *Id.*; [72] ("Receiver Order"). BrightStar now moves to sanction Defendants based on their repeated violations of these Orders

and Defendants' submission of perjured testimony. [124]. BrightStar also moves for Rule to Show Cause why non-party James Snow ("Snow"), Foreside's Chief Financial Officer ("CFO") should not be held in contempt and sanctioned for aiding and abetting Defendants' violations. [132].[1] For the reasons stated herein, BrightStar's motions [124] [132] are granted in part.

## PROCEDURAL HISTORY

Given the breadth of allegations contained in BrightStar's motions and the importance of the chronology of the Court's prior orders to the disposition of Plaintiff's motions, it is necessary to detail the procedural history of this case in detail.

BrightStar is a franchisor of BrightStar Care Agencies, a home health care provider using systems developed by BrightStar. BrightStar is the exclusive owner of its proprietary systems, and pursuant to written franchise agreements, grants its franchisees licenses to use those systems subject to the agreements' terms. Foreside is a former BrightStar franchisee owned by Mr. and Mrs. Woodsum. Foreside's franchise agreements with BrightStar contain certain post-termination terms that: (1) restrain Foreside's ability to compete against BrightStar in certain geographic regions and to solicit BrightStar's customers for a period of eighteen months; and (2) oblige Foreside to transfer its client lists and phone numbers in connection with its business to BrightStar. In July 2025, Mr. and Mrs. Woodsum elected not to renew

[1] BrightStar no longer moves for Rule to Show Cause against non-parties Healthy Mind Home Care, Inc. and its owner, former Foreside CFO Kelly Liu.

their franchise agreements with BrightStar and allowed these agreements to expire. In July 2025, BrightStar brought this action seeking a preliminary injunction prohibiting Defendants from violating the post-termination terms of their franchise agreements. [1].

### A. Preliminary Injunction Order

BrightStar moved for a preliminary injunction on August 4, 2025. [13]; [14]. In opposition to BrightStar's motion, Mr. Woodsum filed a sworn declaration stating that Mrs. Woodsum retired from Foreside on January 1, 2025, and had not had any role with or received compensation from Foreside in 2025 or after the expiration of the franchise agreements. [32-1] at ¶ 7; *see also* [30-2] at ¶ 8. Mrs. Woodsum also filed a declaration stating that she was "no longer an active employee with Foreside Management Company . . . at any time in 2025." [30-4] at ¶ 3.

On October 29, 2025, the Court entered an order granting in part BrightStar's motion for a preliminary injunction. [45]. The Court found Plaintiff was likely to prove the franchise agreements' post-termination restrictive covenants were enforceable and that Defendants were in breach by: (1) continuing to use BrightStar's confidential information; (2) breaching the franchise agreements' non-compete covenants; (3) continuing to hold themselves out as a former BrightStar franchise; (4) failing to return BrightStar's confidential information and property; (5) refusing to transfer to BrightStar telephone numbers Defendants used in connection with their franchisee operations; (6) failing to provide BrightStar a list of Foreside's clients, contacts, and employees; (7) continuing to use components of the BrightStar Agency

Program; and (8) continuing to use BrightStar's signage. *Id.* at 16–23. The Court found that BrightStar had demonstrated irreparable harm and a lack of an adequate remedy at law and granted BrightStar's motion. *Id.* at 24–26.

On November 19, 2025, the Court entered an order outlining the terms of the preliminary injunction. [52] ("Preliminary Injunction" or "Preliminary Injunction Order"). The Preliminary Injunction Order prohibited Defendants, "directly or indirectly, for themselves or through, on behalf of, or in conjunction with any person or entity," from:

> "Owning, managing, operating, maintaining, engaging in, consulting with or having any interest in any business that provides[:] (a) supplemental healthcare staff to institutional clients, such as hospitals, nursing homes, and clinics; (b) comprehensive care, including medical and non-medical services, to private duty clients within their home; and/or (c) any other services or products BrightStar authorized Defendants to offer or sell in connection with the operations of their former BrightStar Care Agencies: (1) at the premises of Defendants' former BrightStar Care Agencies; (2) within the Protected Territories of Defendants' BrightStar Care Agencies; or (3) within 25 miles of any BrightStar Care Agency or other BrightStar Care location, whether franchised or owned by BrightStar or its affiliates that would be considered a Competing Business"

for a period of eighteen months. *Id.* at ¶ A. The Preliminary Injunction Order also forbade Defendants from "directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person or entity, soliciting business from customers of Defendants' former BrightStar Care Agencies or from any of BrightStar's referral sources (including without limitation National Accounts), or contacting any of BrightStar's suppliers or vendors for any competitive business purpose" for a period of eighteen months. *Id.* at ¶ B. The Preliminary Injunction Order also required

Defendants to "immediately": "(1) cease using in any manner whatsoever . . . any methods, procedures, technology, or other components of the BrightStar Care Agency Program in which BrightStar has any right, title, or interest; (2) cease representing to the public that they or any of their businesses is or was operated in any way connected with the BrightStar Care Agency Program . . . ; (3) cease using or disclosing any Confidential Information . . . including without limitation all prospective and current client information; cease using all telephone numbers and listings used in connection with the operation of Defendants' BrightStar Care Agencies and take all necessary steps to transfer those telephone numbers to BrightStar . . . ; (4) return to BrightStar the Confidential Information . . . including customer information; and (5) provide BrightStar a complete list of any outstanding obligations Defendants may have to any third parties with respect to their former BrightStar Care Agencies." *Id.* at ¶ C.

**B. Court-Mandated Letter to Foreside Clients**

To minimize the impact on Foreside's patients, the Court gave Foreside thirty days to cease operations. [50] (ordering Foreside to transfer its clients and shut down by December 19, 2025). To this end, the Court ordered the parties to issue a single Court-approved letter to all Foreside clients regarding their transition of care. *Id.* The letter, dated November 20, 2025 (but sent on November 24, 2025), informed Foreside's clients that Foreside "must cease operations" by December 19, 2025, and would "transition [Foreside's clients'] care to a new, qualified provider." [51]. The letter emphasized that the provider Foreside's clients choose to transition to was

"ultimately up to [them]." *Id.* However, the version of the letter Foreside disseminated to its clients included a prominent[2] cover letter from Foreside's Director of Nursing Analiese Burrell. [63-2] ("Cover Letter"). The Cover Letter instructed clients *to disregard the Court-approved letter* and indicated that while Mr. Woodsum would "need to step away from the company and the industry," Foreside was "not going anywhere" and would continue through a "new entity . . . established in its place" using "the same office" and "the same employees," and clients did "**not need to find new care**." *Id.* (emphasis original). Clients with any questions were urged to "contact [Burrell] directly." *Id.*

Prompted by Defendants' failure to transition their phone numbers, turn over customer information, and produce to BrightStar the as-sent version of the letter sent to clients, on December 9, 2025, BrightStar filed a Motion for Rule to Show Cause why Defendants should not be held in contempt and sanctioned for violations of the Preliminary Injunction Order. [56]. After receiving a copy of the as-sent client letter, including the Cover Letter, BrightStar filed a supplement to its Motion for Rule to Show Cause why Defendants should not be sanctioned for this additional misconduct. [63].

In response, Burrell submitted a declaration claiming that she authored the Cover Letter herself, "on [her] own initiative," and Mr. Woodsum "had no role in

---

[2] The Cover Letter was stapled to the top of physical copies of the Court-approved letter. For copies transmitted over email, the Cover Letter was the body of the email while the Court-approved letter was an attachment to the email.

drafting the cover letter nor in it being sent out." [64] at ¶ 4; *see id.* ("He did not direct me to write the Cover Letter and did not know anything about it until after I sent it out."). Burrell's declaration also disclosed that she had sent a similar letter to Foreside's employees explaining that the Preliminary Injunction Order caused Mr. Woodsum to "step[] away from the company and the industry for 18 months," but that the order "affects only him—not our operations, your jobs, or the care we provide." [64-2] ("Employee Letter"). Further, the Employee Letter stated "[o]ur company name . . . is NOT changing," nor is the office, leadership team, staff and scheduling, or type of clients. *Id.* (emphasis original). "What is changing is the legal entity name behind the scenes." *Id.* As with the Cover Letter, Burrell's declaration explained that "Mr. Woodsum did not direct [her] to write" the Employee Letter, "had no role" in writing it, and "had no knowledge of it before it was sent out." [64] at ¶ 8.

### C. December 18, 2025 Hearing

At a hearing on December 18, 2025 regarding BrightStar's Motion for Rule to Show Cause, the Court ruled that Burrell had "acted in direct violation of the court order" and "misrepresent[ed] the situation to Defendants' clients." [69]. In pertinent part, Mr. Woodsum testified under oath that: (1) he was aware that the purpose of the Court-mandated letter was to avoid multiplying communications sent to Foreside clients, [81] ("Dec. 18 Hr'g Tr.") at 13:17–24; (2) he knew of the Cover Letter but had never seen it *before the hearing*, *id.* at 16:21–17:3, 31:8–21; (3) he "personally communicated" with two clients regarding transferring to other providers but had not done so during the last thirty days, *id.* at 20:3–12; (4) Foreside would close the

following day, he did not know what would happen next, and did not "have a plan for this," *id.* at 21:2–5; (5) no new entity had been set up to take Foreside's place, *id.* at 24:21–25:12 ("what happens as far as another company, another entity . . . that's beyond my control"); and (6) starting the following day his employees would be locked out of Foreside's office, *id.* at 26:14–18. The Court observed that Defendants were either dealing with "a rogue employee," Burrell, "or they're in on this. And if they are, there's going to be costs and sanctions and all that." *Id.* at 34:12–16.

### D. Receiver Order

On December 19, 2025, the Court appointed a Receiver "[t]o ensure immediate and full compliance" with the Preliminary Injunction Order and "promote the orderly transition of client care to new providers, as envisioned by both the Preliminary Injunction Order and the previously approved joint client communication." [67] ("Receiver Order") at 1. The Court ordered that the Receiver "shall have full and sole authority to operate, oversee, and manage Foreside's business and to oversee, implement, and enforce compliance with the Court's Preliminary Injunction Order, including without limitation[:] (a) the transfer of all of Foreside's clients to new providers, and (b) the transfer of telephone numbers used in connection with Defendants' former BrightStar Care Agencies to BrightStar or its designee." *Id.* at ¶ B.1. The Court ordered that the Receiver "take immediate and exclusive possession, custody, and control of all assets, books, and records of Foreside," "have unfettered access to all of Foreside's assets . . . bank accounts . . . computers . . . telephones, telephone numbers, client information, prospective client information,

and employee information," and business locations for the purpose of implementing the Preliminary Injunction Order. *Id.* at ¶¶ B.2–4. The Court ordered Defendants to pay the Receiver's reasonable expenses, and directed Mr. and Mrs. Woodsum to "fully cooperate with the Receiver." *Id.* at ¶¶ B.8, C. The Court reserved ruling on any remedies to be issued on the Motion for Rule to Show Cause, "including without limitation any sanctions to be issued and any attorneys' fees to be awarded." *Id.* ¶ G.

On December 23, 2025, the Court issued an order largely repeating the Court's December 19 ruling and extending the deadlines for Defendants to transition their clients from December 19, 2025 to January 16, 2026 and extending the date to cease Foreside's operations to February 24, 2025. [72] at ¶ A.

### E. Receiver Reports

At a January 6, 2026 status hearing the Receiver raised concerns that Foreside personnel had requested clients to complete forms to transition their care to an entity called "Foreside Corporation." [74]. In a Minute Entry, the Court ruled that "[s]uch conduct is a violation of the Court's previous orders" and ordered "any Foreside personnel who have requested clients to complete such a form [to] notify the Receiver immediately and make any such forms available to the Receiver no later than Friday, January 9, 2026." *Id.*

On January 16, 2026, the Receiver filed his First Report, Recommendations, and Petition for Instructions. [80] ("Receiver's First Report"). The Receiver reported that Defendants were not cooperative in providing the documents and information necessary to timely satisfy the Receiver's charge and that he had not obtained access

to Foreside's electronic database of client information until January 8, 2026. *Id.* at 1. The Receiver also reported that he had only transferred a few of Foreside's clients to new providers, in part due to Foreside's efforts to have clients sign new agreements relating to the transition of client services. *Id.* at 4 n.3. The Receiver reported he would be unable to complete all client transitions and cease Foreside's operations by the Court's deadline. *Id.*; *id.* at 2–4. Finally, the Receiver sought clarification as to whether he was to facilitate the cessation of Foreside's operations beyond its home health care service—mainly, its placement service for school nurses, and a childcare related service. *Id.* at 6. On January 22, 2026, the Court again ordered the cessation of all Foreside's operations for which Foreside was paid royalties under the BrightStar franchise agreement and reiterated that the Receiver was to have "full and unfettered access to Foreside's assets, books, and records." [83]. The Court extended the deadlines to transition Foreside's clients to other providers to February 24, 2026, and to cease Foreside's operations to March 27, 2026. [82].

The Receiver filed a supplement to his First Report on January 29, 2026. [90] ("Supplemental Report"). The Receiver reported that while Mr. Woodsum had provided the Receiver with login access to Foreside's Wells Fargo Bank account, he had not been granted administrative access, and "neither Defendant Woodsum nor Foreside have made available to the Receiver <u>all</u> of the access and information subject to this request." *Id.* at 2 (emphasis original). The Supplemental Report also indicated that he was alerted by a Foreside client that Foreside employees had provided clients with a new Service Agreement purporting to transition clients to an entity titled

"Healthy Mind Home Care Inc. DBA Foreside Home Care & Nursing" ("Healthy Mind"). *Id.* at 2–3.

The Receiver's Second Report, Recommendation, and Petition for Order in Aid of Receivership, filed February 5, 2026, [94] ("Receiver's Second Report"), indicated that the Receiver "continue[d] to face unanticipated and—in his view—problematic delays in obtaining access to critical Foreside accounts, documents, and records." *Id.* at 2. The Receiver reported that Healthy Mind was associated with former Foreside CFO Kelly Liu, was using Foreside's name and address, and "Mr. Woodsum had not been truthful when he denied, orally and in writing, any participation in or knowledge of efforts to transition Foreside clients to Healthy Mind." *Id.* At the time of the Second Report, the Receiver had transitioned forty-two Foreside clients to other providers, and twenty-two remained to be transitioned, but he was "unable to confirm whether he has, in fact, been granted completed access to all client files," *id.* at 7, and he remained concerned "that the solicited transitions [to Healthy Mind] may reflect an intentional effort by Foreside employees to violate the terms of the Court's orders, including its Preliminary Injunction." *Id.* at 4–5. The Receiver was also still being denied "unfettered" access to the records required in the Court's prior orders, including Foreside's Wells Fargo account, Foreside's email accounts, Foreside's QuickBooks account, and materials related to a number of *additional lawsuits* against Foreside which Defendants did not disclose to the Receiver until January 27, 2026. *Id.* at 2–3, 6–7. To aid in resolving these issues, the Receiver requested that the Court enter an order granting the Receiver the authority to act regarding the other

pending lawsuits against Foreside, and clarifying that the Receiver "enjoys exclusive authority over Foreside and its assets," "enjoining Foreside personnel, including defendants Mark and Claire Woodsum, from purporting to act on behalf of Foreside with respect to any third parties," "authorizing the Receiver to obtain discovery," and barring Foreside, Mr. and Mrs. Woodsum, and any Foreside personnel "from engaging in any act or omission intended to or which . . . interferes with [the Receiver's] administration of the [Foreside] estate." *Id.* at 9.

In response to the Receiver's Second Report, Defendants submitted a response stating that they "affirmatively represent that they are not affiliated in any way with [Healthy Mind], be it financial or otherwise, directly or indirectly" and "have nothing to do with Healthy Mind and have not taken any actions in support of Healthy Mind in violation of any order of this Court." [96] at 1. Further, Defendants affirmed that "Mr. and Mrs. Woodsum are not engaged in any communications with clients regarding the transfer of their care." *Id.* at 2.

At a status hearing held on February 10, 2026, the Court ordered a Foreside employee to immediately "generate a complete list of all Foreside clients not just home healthcare clients as of 12/19/25 and as of today's date," and that the Foreside employee responsible was "not to leave the Foreside office until this task is completed." [97]. At that hearing, counsel for Defendants withdrew, and the Court reminded Mr. Woodsum, Mrs. Woodsum, and Foreside "of their continuing obligation to comply with court orders in the interim period without representation." [98].

Finally, the Court entered the Receiver's requested order in aid of the receivership. [99].

On March 5, 2026, the Receiver filed his Third Report, Recommendation, and Petition for Instructions of Receiver. [119] ("Receiver's Third Report"). The Receiver reported that he had made "significant progress" in transitioning Foreside's clients to other home health care providers, had gained access to Foreside's email accounts, and was provided administrative access to Foreside's Wells Fargo account. *Id.* at 2. The Receiver also indicated that the client list obtained as a result of the Court's February 10 order indicated that ninety-three clients remained to be transitioned to new providers, and that approximately fifty-one still remained to be transferred as of the date of the Receiver's Third Report, so he required additional time to complete the client transfer process. *Id.* at 3. Further, the Receiver was engaged in investigating whether any Foreside clients had been transitioned to Healthy Mind, and if so, what had become of them. *Id.* at 4. Finally, the Receiver noted that, contrary to the Receiver Order, on February 24, 2026, Mr. Woodsum had initiated a $25,000 wire transfer from Foreside's Wells Fargo bank account to a law firm engaged to represent Defendants in this matter without authorization, despite the Receiver writing to Mr. Woodsum earlier that day to advise that "counsel should confer directly given the principles governing a receivership entity's obligation to pay for the defense of its pre-receivership form." *Id.* at 6.

Upon receipt, the Court extended the deadlines to transition Foreside's clients to April 3, 2026, and to terminate Foreside's operations to May 22, 2026, and ordered

the Receiver to file a supplemental report to indicate whether Mr. Woodsum should be denied access to Foreside's Wells Fargo account. [121]. The Receiver did so on March 11, 2026, writing that "this court has already definitively established that the Receiver alone enjoys authority and control over Foreside's assets, including the [Wells Fargo] account" and recommended that the Court "reaffirm its existing orders regarding the Receiver's exhaustive authority and control over Foreside's assets." [123] ("Second Supplemental Report") at 1–2 (emphasis original). The Court did so on March 12, 2026, reaffirming that "the orders previously entered establish beyond question the Receiver's **exclusive authority and control** over Foreside's assets, including the [Wells Fargo] [a]ccount." [126] (emphasis original).

### F. Sanctions Motions

BrightStar brought the instant motion for sanctions against Defendants for violations of the Preliminary Injunction and Receiver Orders, and Defendants' submission of perjured testimony, on March 11, 2026 [124], and a Motion for Rule to Show Cause why non-party Snow, Foreside's CFO, should not be held in contempt for aiding and abetting Defendants' violations on March 13, 2025.[3] [132]. These motions allege dozens of individual violations of the Preliminary Injunction and Receiver Orders, including but not limited to those the Court and Receiver had already noted on the record. In summary, these allegations pertain to:

[3] As stated, Plaintiff withdraws its motion with respect to non-parties Liu and Healthy Mind.

1. Defendants' December 2025 refusal to turn over Foreside's customer information and phone numbers to BrightStar, prompting the Court to appoint the Receiver to ensure Defendants' compliance with the Preliminary Injunction Order;
2. Defendants' misconduct surrounding Burrell's Cover Letter and Employee Letter;
3. Evidence contradicting Mr. Woodsum's testimony in December 2025 that he was not aware of the letter before it was sent and had not seen the Cover Letter prior to the December 18, 2025 hearing;
4. Mr. Woodsum's December 2025 efforts to purchase another home health entity in order to circumvent the Preliminary Injunction Order, evidenced by his meeting with and statements made to his business brokers;
5. Defendants' failure to promptly turn over Foreside's complete client information to the Receiver until February 10, 2026;
6. Defendants' failure to grant the Receiver immediate and full access to the necessary Foreside vendor accounts;
7. Mr. Woodsum's February 2026 transfer of $25,000 out of Foreside's Wells Fargo bank account;
8. Foreside's continuing operations well into 2026 notwithstanding the Court's Preliminary Injunction Order, including recruiting and hiring additional employees, Mr. Woodsum continuing to hold himself out as Foreside's CEO, and solicitation of new clients;

9. Mr. Woodsum and Snow's control over Healthy Mind as a successor in interest to Foreside;
10. Snow's solicitation of Foreside clients and new clients to Healthy Mind;
11. Mr. Woodsum's outreach to and solicitation of clients from BrightStar National Account, Bright Horizons; and
12. Mr. and Mrs. Woodsum's false statements to the Court, including their statements leading up to and at the December 18, 2025 hearing, and statements that Mrs. Woodsum had not been an employee of Foreside since January 2025 despite remaining a member of its leadership team and continuing to perform work there.

[124]; [127]; [132]. Defendants and Snow deny these allegations and argue that their actions were not in violation of either order because these orders were vague or ambiguous, or because Defendants did not participate in the alleged conduct. [161]; [163]; [172].

## STANDARD

Federal courts have inherent authority to sanction litigants "for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). The Court's equitable powers in civil contempt proceedings are "broad," *Spallone v. United States*, 493 U.S. 265, 276 (1990), and include the authority to impose sanctions to coerce compliance with a court order, *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994), and to compensate affected persons and entities "for losses caused by contemptuous actions." *Tranzact Techs., Inc. v. 1Source*

*Worldsite*, 406 F.3d 851, 855 (7th Cir. 2005). To be held in civil contempt, a party "must have violated an order that sets forth in specific detail an unequivocal command from the court." *United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001). "To prevail on a request for a contempt finding, the moving party must establish by clear and convincing evidence that[:] (1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply." *NAV Consulting, Inc. v. Kumawar*, 2024 WL 4333290, at *2 (N.D. Ill. Sept. 28, 2024) (quoting *S.E.C. v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010)). To impose sanctions, a federal court must find by a preponderance of the evidence that "the culpable party willfully abused the judicial process or otherwise conducted the litigation in bad faith." *Ramirez v. T&H Lemont, Inc.*, 845 772, 776 (7th Cir. 2016). "Mere clumsy lawyering is not enough" to merit the imposition of sanctions. *Fuery v. City of Chi.*, 900 F.3d 450, 464 (7th Cir. 2018).

If such contempt has occurred, a wide range of sanctions are available to coerce compliance and compensate the affected party for losses caused by the contemnor's actions. *Chambers*, 501 U.S. at 53–54. These sanctions include daily fines, attorneys' fees and costs, disgorgement, and referral to the U.S. Attorney's Office for prosecution for perjury. *E.g.*, *Pearle Vision, Inc. v. Romm*, 2007 WL 1752596, at *5 (N.D. Ill. June 14, 2007) (awarding daily fine for each day the franchisee failed to comply with preliminary injunction); *Teledyne Techs. Inc. v. Shekar*, 739 F. App'x 347, 352 (7th

Cir. 2018) (affirming award of fees and costs for violation of preliminary injunction); *Connolly v. J.T. Ventures*, 851 F.2d 930 (7th Cir. 1988) (affirming disgorgement as appropriate remedy for contempt); *Brown & Brown, Inc. v. Ali*, 592 F. Supp. 2d 1009, 1051 (N.D. Ill. 2009) (referral to U.S. Attorney's Office for prosecution for perjury).

## ANALYSIS

BrightStar moves for sanctions against Defendants based on their repeated violations of the Court's Preliminary Injunction and Receiver Orders and Defendants' submission of perjured testimony [124], and for rule to show cause why non-party Snow, Foreside's CFO, should not be held in contempt and sanctioned for aiding and abetting Defendants' violations. [132].

### I. Construction of the Court's Preliminary Injunction & Receiver Orders

First off, Defendants propound a global argument that the Court's Preliminary Injunction Order and Receiver Order were ambiguous, and therefore Defendants' conduct did not violate them. Specifically, Defendants argue that the Preliminary Injunction Order did not expressly or otherwise require Defendants to cease Foreside's operations because it did not order Defendants to cease performing any and all non-competitive revenue generating activities under Foreside, such as its school nurse placement services and childcare-related services. [163] at 24. Defendants also argue that the Receiver Order was ambiguous because they believed it *required* (as opposed to forbade) them to participate in the process to transfer

Foreside clients to other providers. *Id.* at 7–8, 18. The Court disagrees with both arguments.

The Preliminary Injunction Order required Foreside to shut down. Defendants argue they did not believe that the Preliminary Injunction Order applied to Foreside's allegedly "non-competitive revenue generating services" such as school nursing and childcare services, rendering innocent Defendants' post-injunction efforts to hire additional Foreside employees, interactions with vendors, purchase of supplies such as Foreside-branded uniforms, and review of clients who transferred their care elsewhere. *Id.* at 24–25. But the Preliminary Injunction Order expressly and unambiguously forbade Defendants from "owning, managing, operating, maintaining, engaging in, consulting with or having any interest in any business that provides [] supplemental healthcare staff to *institutional clients*, such as hospitals, nursing homes, and clinics."[4] [52] at ¶ A (emphasis added). It also enjoined Defendants from having any interest in any business that "provides . . . comprehensive care, including medical and non-medical services, to *private duty clients within their home*." *Id.* (emphasis added). Childcare and school nurse programs are clearly within the ambit of the "institutional clients" or "private duty clients" contemplated by the Order.

---

[4] Furthermore, the Court-approved client communication clearly and unambiguously stated that Foreside would shut down. [51].

Defendants also argue that the Preliminary Injunction Order did not apply to services outside the restricted geographic area. [163] at 24–25. That is true. But Defendants have already conceded under penalty of perjury that the franchise agreements' geographic coverage applies to the entirety of Foreside's business. Mr. Woodsum's declaration opposing BrightStar's motion for a preliminary injunction states that enforcing the franchise agreements' geographic restrictions (forbidding Defendants from operating a home health care business within twenty-five miles of any BrightStar franchisee) would mean that "Foreside would be functionally unable to operate as a business . . . in California." [32-1] at ¶ 15. Foreside only operated in California. Therefore any argument that the Preliminary Injunction Order did not cover Foreside's activities outside of the restricted area is strictly theoretical and cannot protect Defendants' conduct.

Second, the Preliminary Injunction Order and the Receiver Order clearly did not allow, let alone require, Defendants to participate in the client transfer process. Defendants argue that the Orders required their involvement because the Receiver Order set a deadline for "Defendants to transition all clients to new providers," meaning that Defendants' work to transfer Foreside's clients to Foreside Corporation, Healthy Mind, or any other entity was not just permissible, but required.[5] [163] at 6–

[5] Defendants also point to Snow's assertion that Dora Orgill, a member of the Receiver's staff, instructed Foreside employees including Snow to be more involved in transferring Foreside's clients. [163] at 28; *see also* [161] at 6. The Receiver wrote separately to contest this assertion, stating he is "confident that no such contradictory instructions were ever given by me, my lead administrator . . .

8, 127–28. This ignores the core tenant of the Preliminary Injunction Order, which forbade Defendants from "directly or indirectly . . . soliciting business from customers of Defendants' former BrightStar Care Agencies." [52] at ¶ B. Furthermore, the Receiver Order gave the Receiver the "*full and sole authority* to operate, oversee, and manage Foreside's business" including "compliance with the Court's preliminary injunction order, including without limitation . . . the *transfer of all of Foreside's clients* to new providers," and forbade Defendants "from communicating directly or indirectly with any current or prospective clients." [72] at ¶¶ B.1; C (emphasis added). These statements make clear that Defendants were to play no role in the transition of clients.

Finally, Defendants argue that the Orders were ambiguous due to the Court's numerous follow-up orders "clarifying" their scope. [163] at 1, 3, 24–25. But these Orders were prompted by Defendants' repeat violations of previous orders. Defendants characterize these subsequent orders as "clarifications" necessary to define the scope of the Court's Orders due to BrightStar's sloppy draftsmanship. *Id.* Not true. Defendants' continued misconduct necessitated follow-up orders from the

---

or Dora Orgill." [166] at ¶ 6. Orgill also issued a sworn declaration "refut[ing], in the strongest possible terms, Mr. Snow's assertion that [she] made the statement attributed to [her], or that [she] otherwise stated, suggested, or implied to Mr. Snow or any other Foreside personnel, that Foreside was authorized to transfer clients." [164] at ¶ 4. Defendants' evidence to the contrary is pulled from Snow's pro se response to Plaintiff's Motion for Rule to Show cause, not a sworn declaration signed under penalty of perjury or backed by evidentiary support, so does not counter the Receiver or Orgill's declarations. *See* [161]; Fed. R. Civ. P. 11(b)(3); 28 U.S.C. § 1746(2). When Snow eventually submitted a sworn declaration, he did not include this assertion. Therefore, the Court does not credit Snow's unsworn assertion here.

Court *reiterating* that violating the franchise agreement and the Court's orders was forbidden.

To summarize, the Preliminary Injunction Order and Receiver Order clearly and unambiguously required Defendant Foreside to shut down and forbade Defendants from participating in transferring any clients to other providers most significantly any reincarnation of Foreside.

## II. Factual Bases for Sanctions

Having outlined the contours of Defendants' obligations, Plaintiff raises the following instances of sanctionable conduct—inclusive of conduct which was previously raised to the Court through Plaintiff's Motion for Rule to Show Cause and the Receiver's reports, as well as additional conduct which has come to light as a result of discovery and is before the Court for the first time.

### A. Burrell Letters

The Court has already ruled that Defendants' conduct surrounding Burrell's Cover Letter and Employee Letter violated the Preliminary Injunction Order. [72] at 1. Having unearthed further evidence regarding Defendants' advance knowledge of and participation in this conduct, Plaintiff now moves for sanctions.

Defendants acknowledge that Burrell's Cover Letter was sent to Foreside's clients but argue that no order expressly forbade this communication at the time. [163] at 5 n.3, 14–15. The Preliminary Injunction Order expressly forbade Defendants from "soliciting business from customers of Defendants' former BrightStar Care Agencies" and "directly or indirectly" contacting them "for any

competitive business purpose," such as retaining their business at Foreside, Foreside Corporation, or attempting to transfer them to another home care entity. [52] at ¶ B. That is precisely what the Cover Letter did—it encouraged Defendants' former BrightStar franchisee's clients to stay with Foreside, a competing business, and urged them not to seek care elsewhere.

Further, the Cover Letter expressly contradicted the substance of the Court-approved letter. The Court-approved letter notified Foreside's clients that it would shut down and directed them to "transition [their] care to a new, qualified provider." [51]. The letter was intended to serve as the sole client communication in order to limit confusion and prevent any unnecessary gaps in patient care.[6] The Cover Letter served to sow confusion. Following receipt of both letters, several clients contacted Burrell and other Foreside employees to express their concerns. [128-6] at 2 ("The attached letter and the email say 2 different things. The letter says you are ceasing operation and we need to find new care, but the email says you will be continuing while Mark takes an 18 month sabbatical. Do we need to find a new provider?"); [128-7] at 2 ("I'm a little confused, the email says nothing is changing, and the letter saying [sic] you are closing the business, and we need to find new agencies for our patients. Would you please elaborate on that?"). In each instance, Foreside employees

[6] Mr. Woodsum already stated that he understood that the purpose of the Court-approved letter was to avoid multiple communications being sent to Foreside clients because it would be confusing. Dec. 18 Hr'g Tr. at 13:17–24 (agreeing that the Court-approved letter "was done because the Court did not want multiple communications sent out to patients, many of whom are elderly" because "that would be confusing.").

responded that these clients did not need to find new care and that Foreside would continue operating without interruption—conduct expressly forbidden by the Preliminary Injunction Order. *Id.*; [128-6] at 2. The Cover Letter also "prevented the patients that you care so much about from actually arranging for care because they are expecting Ms. Burrell and this new entity to show up on Monday morning." *See* Dec. 18 Hr'g Tr. at 31:24–32:3.

Having ruled—again—that the Cover Letter violated the Preliminary Injunction Order, the Court finds that this conduct was willful and contemptuous on the part of Defendants. At the December 18, 2025 hearing, Mr. Woodsum testified that he learned of the Cover Letter after it was sent out and had never seen it before that day. Dec. 18 Hr'g Tr. at 16:22–17:3, 31:8–21. In support of this argument, Mr. Woodsum filed a sworn declaration that while he had possessed and reviewed *a* draft of a Cover Letter in November 2025, he did not direct Burrell to author it, and had not seen *the final* Cover Letter sent to Foreside's clients before the December 18 hearing, which explains his testimony that he had never seen the Cover Letter before. [163-2] ¶¶ 5–8, 13. In support, Mr. Woodsum points to Burrell's declaration stating that she "authored the Cover letter [herself], on [her] own initiative, after reading the [Court-approved letter]" and that Mr. "Woodsum had no role in drafting the Cover Letter and did not know anything about it until after [she] sent it out." [64] ¶¶ 3–4; [163-2] ¶ 5. This argument, although it splits hairs, could possibly lead to a finding that Defendants' conduct, through Burrell, was not willful. But it is not the only evidence before the Court. Plaintiff has presented other compelling evidence

establishing that Mr. Woodsum not only directed Burrell to draft the letter, he also had a role in drafting and editing it as well, and possessed a copy of the Cover Letter well in advance of the December 18 hearing. These materials, together, establish that Defendants' conduct was willful, and that Mr. Woodsum's lied to the Court on December 18.

On November 20, 2025, the day after the Preliminary Injunction Order, Mr. Woodsum sent the Court-approved letter to Mrs. Woodsum, Burrell, and other Foreside employees and ordered them to come up with a plan to "reach out to ALL of [] our clients before BrightStar does." [128-4] at 2. Two days later, Mr. Woodsum sent the Court-approved letter to Foreside staff and noted that he had "the letter [he] promised from [Burrell] which is the 'cover letter' to [the court-approved] letter" and that he had "decided that since [Burrell], and all employees, can say whatever they want, [] it makes sense to make her cover letter into more of a marketing piece." [128-5] at 2. Burrell replied on November 24, 2025, attaching her "version with a few edits." *Id.* Furthermore, on November 28, 2025, a Foreside client forwarded the as-sent Cover Letter to Mr. Woodsum, and Mr. Woodsum replied referencing the contents of the letter. [128-8] at 2. This was three weeks before he testified that he had never seen the Cover Letter, making that testimony a blatant lie.[7] Furthermore, Burrell later repudiated the portions of her declaration on which Mr. Woodsum relies.

[7] Defendants argue elsewhere that Mr. Woodsum's receipt of an email does not mean that he read it. [163] at 10. That is true in the abstract. But here, Mr. Woodsum replied to the email and referenced the contents of the Cover Letter. [128-8] at 2 (indicating that there will be "more to follow from [Burrell] and the senior management team in the coming weeks").

In her deposition (when she was no longer a Foreside employee), Burrell stated that the statement that Mr. Woodsum had no role in drafting or sending the Cover Letter was "incorrect" because they "went back and forth" about its content, he knew about the Cover Letter as early as November 21, and that sending it was "ultimately his decision." [175-1] at 164:11–16, 243:11–24–244:24, 247:10–19, 248:2–24, 279:10–281:14.

Mr. Woodsum counters this evidence by attempting to argue that BrightStar has failed to present any metadata indicating that he participated in drafting the Cover Letter. [163] at 29. But both Plaintiff and the Receiver repeatedly sought the metadata associated with the Cover Letter, and Defendants refused to produce it. [175-2] at 1; [175-3] at 11 (Req. for Prod. No. 9). Furthermore, Burrell testified that she and Mr. Woodsum went "back and forth" on the Letter's contents, [175-1] at 151:1–9, 164:3–16, so whether Mr. Woodsum personally typed his edits as opposed to discussing them with Burrell is immaterial. Furthermore, whether Mr. Woodsum participated in drafting the letter is only one facet of his perjured testimony—the bulk of which relates to whether Mr. Woodsum directed Burrell to draft the letter and whether he knew about or saw it before it was sent and before the December 18 hearing. The evidence supporting the latter categories is irrefutable. Mr. Woodsum

perjured himself. His conduct amounts to willful contempt. Sanctions for this conduct are more than warranted.[8]

**B. Refusal to Cooperate with the Receiver**

The Preliminary Injunction Order required Defendants to immediately turn over to BrightStar a complete list of Foreside's clients and Foreside's business phone numbers in line with the parties' franchise agreement. [52] at ¶ C.3. Defendants did not do so. This necessitated BrightStar's first Motion for Rule to Show Cause. *See* [56]. The Court has already ruled that Defendants' failure to turn over its client lists between November 20, 2025 and December 18, 2025 violated the Preliminary Injunction Order.[9] [67] at 1. As already noted *supra*, the Preliminary Injunction Order and Receiver Order unambiguously required Defendants to submit their client lists so that clients could be transferred to other providers. Notwithstanding these Orders, the complete list was not produced until February 10, 2026, after the Court

[8] Defendants argue that even if Defendants' conduct surrounding the Burrell letters violated the Preliminary Injunction Order, that BrightStar has already obtained relief through its Motion for Rule to Show Cause predicated on this conduct and the appointment of the Receiver at Defendants' expense. [163] at 2, 15. But the record is clear that the Court contemplated that there would be additional sanctions for Defendants' conduct from the start. First, the Court stated at the December 18 hearing that if it came to light that Defendants were involved in Burrell's conduct, there would be "costs and sanctions . . . ." Dec. 18 Hr'g Tr. at 34:12–16. Second, the Receiver Order expressly contemplates that appointment of the Receiver was not the only sanction resulting from Defendants' violations. The Court reserved ruling on any *remedies* related to Plaintiff's Motion for Rule to Show Cause for a later date. [72] at ¶ G. Furthermore, the Court, by necessity, issued the order appointing the Receiver without the factual record now before it. Having reviewed the full record, the Court determines sanctions are warranted. *Infra* Section III.

[9] The Court is not aware of any further dispute regarding Defendants' phone numbers following the December 18 hearing. Therefore, the Court's assessment focuses on Defendants' failure to timely provide Plaintiff with a complete client list in violation of the Preliminary Injunction and Receiver Orders. However, Defendants' initial failure to transfer their phone numbers to BrightStar also violated the Preliminary Injunction and is addressed *infra* Section III.

ordered a Foreside employee to produce the list *that day*. [97]. Plaintiff posits that Defendants intentionally impeded the Receiver's efforts to secure the complete list in order to buy time to secure these clients for entities affiliated with Foreside and the Woodsums (more on this below). This contention is supported by the record. Defendants willfully refused to submit a complete client list to BrightStar and the Receiver in violation of this Court's orders.

Defendants argue that the Receiver Order not only did not forbid them from working to transition their clients, it required them to do so. [163] at 6–7, 16. The Court disposed of this argument *supra* Section I. Defendants also argue that they did not violate the Receiver Order because by the time of the Receiver's Second Report, the Receiver had made significant progress in transitioning Foreside clients to other home care providers. [163] at 12, 19 (citing [94] at 2). That Foreside's clients were eventually transitioned does not undercut what it took to get there.[10] Defendants' obstruction of the Receiver's efforts to recover Foreside's client list is well-documented. In his first submission to the Court, the Receiver reported Defendants were not cooperating in providing "the documents and information necessary to timely satisfy the Receiver's charge," and that he had not obtained "prompt access to the requested records, including the client files necessary to transition [F]oreside

[10] The Receiver later wrote to diplomatically counter the assertion that "successful transition of Foreside's clients demonstrates that Defendants have not obstructed or otherwise impeded the Receiver's administration of his duties," stating, "I simply do not agree with this assertion; the Receiver Reports are replete with examples of what I determined to be a lack of cooperation or transparency on the part of Defendants and Foreside personnel whom I understood or believed to have been taking direction from Defendants." [166] at ¶ 5.b.

clients." [80] at 1, 3. When Defendants finally gave the Receiver access to its client list, the list was woefully incomplete: the Receiver's Second Report notes that Foreside had sixty-four clients, *see* [94] at 4 (noting that twenty-two clients remained to be transitioned and forty-two had already transitioned their care or cancelled their service agreements), but the final list contained at least ninety-three clients.[11] [119] at 3. Defendants provide no explanation for the discrepancy between these lists.

Defendants also failed to provide the Receiver with prompt access to the files necessary to administer his duties. In his First Report, the Receiver wrote that he had "encountered difficulty in obtaining from Foreside and its personnel the documents and information necessary" to discharge his duties. [80] at 1–2. In his Supplemental Report filed a few weeks later, the Receiver had specified for Defendants a list of accounts and vendors to which he required access in order to proceed. [90] at 2. As a result, Defendants had granted him access to some of these platforms, but notably not administrative access to Foreside's Wells Fargo bank account. *Id.* The Receiver did not receive full access to this account, as well as Foreside's email systems, QuickBooks, and client transition records *until March 2026*—over two months after the Receiver Order required "immediate" and "unfettered' access. [94] at 5–7; [119] at 6–7; [72] at ¶¶ B.2–3.

---

[11] BrightStar notes that the number of clients ultimately provided by Foreside is inconsistent with the 340 clients Foreside possessed on average between January and July 2025. [127] at 16; [128-25] at ¶ 7. Defendants do not counter this contention or attempt to explain this discrepancy. However, as Plaintiff's figures are based on a single declaration as opposed to raw data, the Court finds the Receiver's figures more reliable for the purposes of adjudicating this motion.

Mr. Woodsum provides a detailed accounting of the reasons for the delay in providing the Receiver with administrative access to Foreside's Wells Fargo account. [163] at 8–9. The Court is satisfied that the alleged "misunderstanding" as to what access level the Receiver required and Mr. Woodsum's stop-gap provision of his personal login credentials justifies this delay.[12] However, Defendants provide no justification for the delay in the Receiver's access to Foreside's email accounts or accounts associated with other vendors. Therefore, the Court is left with the firm conviction that the delay was willful and contemptuously noncompliant with the Receiver Order.

### C. Intent to Continue Operations Past December 19, 2025

Plaintiff argues that Mr. Woodsum's statements at the December 18 hearing that Foreside would shut down and he would be unemployed the following day were false. The Court agrees. The record is replete with evidence that Defendants intended to continue operating past that date and that Mr. Woodsum would not only remain involved, he would continue as Chairman and CEO and spearhead Foreside's preparations to remain in business.

[12] Mr. Woodsum did violate the Receiver Order by transferring $25,000 from Foreside's Wells Fargo account. [119] at 6–7. That the transfer was later reversed by the recipient does not undercut this brazen intrusion on the clear and unambiguous requirement that Defendants give the Receiver "immediate and exclusive possession, custody, and control of all assets." [72] at ¶¶ B.2; B.6 Mr. Woodsum's explanation that he "forgot" he was forbidden from accessing this account is undercut by the contemporaneous saga regarding providing the Receiver with login credentials and the Receiver's assertion to Mr. Woodsum that same day that "counsel should confer directly," *supra*. Thus, while the delay in the Receiver obtaining administrative access to this account does not merit sanctions, the $25,000 transfer supports the Court's sanctions award, *infra* Section III.

*Ten days before* the Preliminary Injunction deadline, Woodsum hired Peter Bastone as Foreside's President and Chief Operating Officer ("COO") and Snow as Foreside's CFO. [128-12] at 4; [128-14] at 2. Mr. Woodsum represented in an email dated December 15, 2025 that he would "retain the Chairman of the Board and CEO titles"—clearly a violation of the injunction against competing with BrightStar for a period of eighteen months. [128-18] at 2. This was apparently evident to Snow, who in a follow-up email questioned if it was "wise to mention in this email that you will remain as CEO & Chairman," and reminded Mr. Woodsum to "stay squeeky [sic] clean here as to how things will be after 12/19."[13] *Id.* On December 17, two days before the December 19 deadline, Mr. Woodsum was coordinating with a vendor to install a sign for "Foreside Home Care & Nursing." [128-16] at 2. On December 18, Mr. Woodsum approved an agreement with Indeed to post positions at Foreside through the following year and began to interview prospective employees. [128-15] at 2; [128-17]. Despite all that activity, Mr. Woodsum testified under oath before this Court that Foreside would be "closed" and he would be "unemployed" the following day. Dec. 18 Hr'g Tr. at 25:5–9. Given his activities in the preceding weeks, Mr. Woodsum's

[13] Snow argues that this comment was based on his "minimal to date observations and similar minimal knowledge of the injunction" and his opinion that Mr. Woodsum "should not be doing anything that would violate those orders," not because he was "aware or had knowledge of any such activity that would undermine the Court Order or Injunction." Dkt. 161 at 1. But this points to the fact that even someone with minimal knowledge of the case could accurately interpret the scope of the Preliminary Injunction Order, and anyway "a party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable." *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019).

testimony that Foreside would close and he would be unemployed on December 19 amounts to perjury.

### D. Engagement With Competing Businesses

The Preliminary Injunction prohibited Defendants from "directly or indirectly, for themselves or through, on behalf of, or in conjunction with any person or entity, owning . . . consulting with or having any interest in any business that provides" home care "within [twenty-five] miles of any BrightStar Care Agency" for a period of eighteen months. [52] at ¶ A. The Preliminary Injunction also forbade Defendants from "directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person or entity, soliciting business from customers of Defendants' former BrightStar Care Agencies or from any of BrightStar's referral sources (including without limitation National Accounts), or contacting any of BrightStar's suppliers or vendors for any competitive business purpose" for a period of eighteen months. *Id.* at ¶ B.

#### i. Foreside Corporation

Defendants initially planned for Foreside to continue operations under the umbrella of a new entity: Foreside Corporation ("Foreside Corp."). After the Preliminary Injunction's December 19, 2025 deadline for Foreside to cease operations, a new entity would be established in Foreside's place and would use the same office, the same employees, and serve the same clients as Foreside. [63-2]. At a hearing on January 6, 2026, the Receiver and BrightStar reported that Foreside and its staff had generated forms soliciting Foreside clients to transition their care to

Foreside Corp. [112] ("Jan. 6 Hr'g Tr.") at 8:17–9:3. This conduct was later corroborated through the deposition testimony of Sarah DiTommaso, a Foreside employee, who testified that she "drove" "three or four" Foreside Corp. agreements with existing clients. [175-7] at 220:16–222:25.

The Court held that this conduct violated the Preliminary Injunction Order, ordered Defendants to cease this activity, and ordered any Foreside personnel who transmitted such a form to "notify the Receiver immediately and make any such forms available to the Receiver." [74]; Jan. 6 Hr'g Tr. at 8:9–10:3. No such forms were made available to the Receiver. [127] at 17. However, through discovery Plaintiff has identified at least four agreements transferring clients to Foreside Corp. *after* the January 6 order.[14] [175-8] 14–36. The Receiver Order forbade Defendants from transferring their clients to another provider—especially a BrightStar competitor run by Defendants and/or Defendants' staff members. [72] at ¶¶ B.1–2. Defendants argue that whether the forms were sent to Foreside's clients is immaterial because the Receiver eventually stopped asking for them. [163] at 7. But, in his own words, just because the Receiver may have determined that reviewing the forms took a backseat to the urgent task of confirming when and to where Foreside's clients had been impermissibly transitioned "should not be viewed as proof positive that the question of who prepared the 'Foreside Corporation' forms and directed that they be circulated

---

[14] Defendants attempt to sow doubt that this occurred because no forms were produced to the Receiver. Plaintiff obtained the forms through discovery and submitted them in support of their Reply brief. [175-8].

was answered to [the Receiver's] satisfaction." [166] at ¶ 5.a. Said differently, that Defendants' other instances of noncompliance sowed chaos and otherwise undermined the Receiver's ability to ensure the expeditious transition of Foreside's clients does not mean the forms were immaterial.

Plaintiff argues that Mr. Woodsum knew that Foreside Corp. would replace Foreside and therefore perjured himself when he testified to the contrary at the December 18 hearing. Dec. 18 Hr'g Tr. at 24:21–25:24; 31:8–21. Defendants argue that Mr. Woodsum's testimony was accurate because he was not involved in directing Foreside personnel to have clients sign forms transferring their care to Foreside Corp.[15] [163] at 21. This is belied by the evidence, including DiTommaso's testimony that she printed the Foreside Corp. agreements directly from a December 16, 2025 email from Mr. Woodsum to staff, styling the Foreside Corp. forms as an "updated service agreement," [175-7] at 214:4–215:6, and an email from Mrs. Woodsum on December 23, 2025 stating that a patient would "need to change the provider to Foreside Corporation" and asking Mr. Woodsum to "please confirm that is the new co name." [128-31] at 2. The Court is left with no other conclusion than this conduct was willful on the part of Defendants and their staff and contemptuously violated the Court's orders.

[15] Even if they did not know about it, "an injunction binds agents and employees of the defendants." *United States v. Di Mucci*, 879 F.2d 1488, 1499–1500 (7th Cir. 1989); Fed. R. Civ. P. 65(d)(2)(B).

### ii. Healthy Mind

Defendants also explored purchasing another home care agency—Healthy Mind Home Care, Inc. ("Healthy Mind"), which conveniently owned a license to operate as a home care agency in California but had no employees or clients of its own. [128-20] at 127:12–128:16. The record reflects that Mr. and Mrs. Woodsum initially met with their business brokers with the intention of purchasing Healthy Mind and transferring Foreside's clients and staff to that entity in order to circumvent the Preliminary Injunction. Ultimately, Mr. and Mrs. Woodsum decided to facilitate the purchase of Healthy Mind by Liu, Foreside's former CFO, all the while surreptitiously retaining control over Healthy Mind so that they could take the company back after the BrightStar noncompete expired. At each step this activity was willful and flouted the Court's orders.

Mr. and Mrs. Woodsum initially explored purchasing Healthy Mind on a series of calls with their business brokers in December 2025. These calls, which were recorded, demonstrate the Woodsums' express purpose was to circumvent the Preliminary Injunction. In a particularly damning call with the business brokers on December 4, 2025, Mr. Woodsum discussed ways he could continue doing business despite the Preliminary Injunction, such as "hav[ing] somebody who can manage the company on my behalf while I'm not here," and while "it won't be my company technically . . . [,] we'll put this into a newco but still . . . it's going to be, you know, in a . . . wink, wink, nod way. It's going to be mine." [128-10]; [133] at 12:37–13:00. In another call on December 16, 2025, Mr. Woodsum explained to his brokers that he

needed to purchase another company because Foreside was "supposed to be into the new company" by December 22, 2025 so "we gotta to get moving on this thing." [128-23]; [131] at 2:39–2:50. Mr. Woodsum also introduced his brokers to Foreside CFO Snow, as well as then-COO Bastone, who "would be the guy filling my role while I'm of counsel, so to speak," *id.* at 00:43–00:52, but that he and Mrs. Woodsum "would have to be the owner of course right away . . . We'd have to own the whole thing."[16] 11:59–12:10. On December 19, 2025, Mr. Woodsum, Bastone, and Snow, had another call with the business brokers and Healthy Mind's then-owner, in which Mr. Woodsum explained that "the only reason we're looking at your company is that we have to put our company into a newco and do some things to protect ourselves because BrightStar is suing us." [128-25]; [131] at 18:44–18:59. Throughout the following days the Woodsums and their staff and business brokers negotiated the deal's structure with the Healthy Mind seller, ultimately determining that Defendants would initially purchase forty-nine percent of Healthy Mind (because Healthy Mind has not been licensed for long enough to sell a majority stake), with an option to purchase the remaining fifty-one percent at a later date. [128-32] at 2; [167-1] at ¶ 10.

Defendants do not refute this record. They concede that they considered purchasing Healthy Mind in December 2025 but assert that this activity did not violate the Preliminary Injunction because Defendants did not ultimately go through

---

[16] This call is more evidence that renders Mr. Woodsum's testimony two days later that "what happens as far as another company, another entity . . . that's not my business, not up to me, and . . . beyond my control" and "there's no new entity," 25:24–26:24, was completely false.

with the transaction. [163] at 15–17, 21–24. Even if this were true, Defendants' unambiguous statements to their brokers that they intended to use a newco publicly controlled by someone else to get around the injunction colors the Court's assessment of what they did next: after initially negotiating the Healthy Mind deal, Defendants substituted Liu[17] as the purchaser rather than get their hands dirty. In Liu's words, Mr. Woodsum "told me to buy the company, and I did." [175-4] at 312:16–22. Liu declared under penalty of perjury that Mr. Woodsum told that Healthy Mind was "his insurance policy," was "worth a lot of money to him," he would refund the purchase price if anything went wrong, and he would buy Healthy Mind from her after eighteen months.[18] [167-1] at ¶¶ 9, 11. Defendants portray this swap as an altruistic act towards a longtime Foreside employee,[19] [163] at 20, but the record shows they actually intended to retain control over Liu, and the company, until the noncompete expired.

---

[17] Plaintiff's reply brief argues that Defendants initially intended Bastone to run Healthy Mind, but that Bastone either could not afford Healthy Mind or withdrew after having second thoughts. [174] at 8. Bastone's declaration in support of this argument was not filed along with Plaintiff's papers; but given the plethora of additional evidence supporting Plaintiff's version of events, Bastone's declaration is not required to rule on Plaintiff's motions.

[18] In his Declaration, Snow says he never heard any discussions about Mr. Woodsum's intent to later purchase Healthy Mind from Liu. [172] at ¶ 5. Even if this were credible, there is no allegation that Snow was present for every single interaction between Mr. Woodsum and Liu during the relevant period. Snow's hearsay statement does not come close to shifting the balance.

[19] In February 2026 Defendants stated that they "are not affiliated in any way with [Healthy Mind], be it financial or otherwise, directly or indirectly," and "have nothing to do with Healthy Mind[] and have not taken any actions in support of Healthy Mind in violation of any order of this Court." [96] at 1. Defendants' change in tune demonstrates that this earlier assertion, which was unsworn, was patently false.

Mr. Woodsum openly represented that he, not Liu, would control Healthy Mind. Consistent with his December 2025 statements to his business brokers that he would control the newco, Mr. Woodsum told Liu that she would "not have to do anything in terms of running the company" because "he could give instructions and help run it behind the scenes," but that he "needed to be careful given the BrightStar litigation and the Court's injunction." [167-1] at ¶ 13. Mr. Woodsum also instructed the seller to communicate with Liu using her Foreside email address. [128-34]. After Liu started to have second thoughts, Mr. Woodsum forbade Liu from selling Healthy Mind to a third party because it would prevent him from taking control of it after the noncompete expired. [167-1] at ¶ 20. He also told a referral service that his "former CFO would be the owner while he stepped away for 18 months but that he was 'brokering' the agreement."[20] [128-26] at ¶ 14.

Snow's activities during this period also demonstrate Defendants' willful involvement with and control over Healthy Mind. Snow was deeply involved in getting Healthy Mind up and running, as well as its day-to-day operations. Snow: (1) served simultaneously as Foreside's CFO and Healthy Mind's general manager, [163] at 26; (2) drove the transfer of Foreside's various vendors and accounts to Healthy Mind, describing Healthy Mind to these vendors as a "new Foreside subsidiary," [128-41] at 2; *see* [128-43]; and (3) filed a statement of fictitious names on behalf of Healthy

[20] Mr. Woodsum denies this conversation ever took place, but this is not credible given the contemporaneous email correspondence between himself and this individual, [128-26] at 6–13, the lack of motivation for this non-party to go out of her way to lie, and Mr. Woodsum's repeat misrepresentations to the Court.

Mind providing that it would d/b/a Foreside Home Care, without Liu's knowledge,[21] [128-45]; [167-1] at ¶ 17. Liu testified that Snow was responsible for getting Healthy Mind up and running, as well as for all operational decisions at Healthy Mind thereafter. [128-20] at 131:12–22, 137:2–18, 140:15–21.

Defendants argue that the above activity was permissible because they acted to help Liu, Liu paid for Healthy Mind herself, she no longer worked for Foreside,[22] and she was not bound by the BrightStar non-compete agreement.[23] [163] at 21–22. Even if these statements were true, the Preliminary Injunction Order unambiguously forbids Defendants from "consulting with" *any* home care business, including Healthy Mind—not just owning and operating their own home health business. [52] at ¶ A. And the record contradicts Defendants' framing. Mr. Woodsum told multiple people that he planned to purchase Healthy Mind from Liu after eighteen months and offered to reimburse her before then if anything went wrong. [167-1] at ¶¶ 9, 11; [128-10] at 34:42–35:42; [128-26] at ¶ 14.

---

[21] Defendants argue that Snow filed this statement without Mr. Woodsum's knowledge and regardless California law does not prohibit two entities from using the same name. [163] at 27; [172] at ¶ 6. Defendants miss the point. Liu filed a declaration under penalty of perjury stating that Mr. Woodsum instructed Snow to file this business name paperwork. [167-1] at ¶ 17. Also, whether this conduct was technically allowed in California is irrelevant, the point is that Snow's actions lead to the inference that registering Healthy Mind to do business under Foreside's name and trade dress was intended to deceive clients into sticking with Foreside and to allow Foreside to continue in business in violation of the express terms of the Preliminary Injunction.

[22] While Liu left Foreside in February 2025, she still used a Foreside email account and still occasionally performed work there, enough so that she attended Foreside's 2025 holiday party. [128-34]; [167-1] at ¶¶ 5, 7.

[23] Snow separately argues that taking over Healthy Mind was Liu's idea. [161] at 3. This statement is unsupported by reference to the record or a declaration and is contradicted by Liu's sworn declaration that Liu's purchase of Healthy Mind was Mrs. Woodsum's idea. [167-1] at ¶ 6.

Not only did Defendants willfully facilitate, support, and consult with Healthy Mind, they worked to funnel dozens of Foreside clients to it. *E.g.*, [161] at 2 ("Everything I did . . . was to attain this goal."); [128-50] (Snow email to Mr. Woodsum regarding the transfer of "all our clients over to Healthy Mind"); [128-44] (Snow email to Foreside vendor stating that Foreside was "transitioning all our clients to another company due to a legal battle . . . The new entity is: Healthy Mind Home Care, Inc."); [128-55] at 2 (Snow email to a Foreside referral source stating he would send it a contract with "Healthy Mind dba Foreside"); [119] at 4 ("[S]ince at least the early days of the receivership, Foreside employees including Mr. Snow . . . have engaged in a concerted and longstanding efforts to transfer clients to Healthy Mind.").

Snow admits to working to transition all of Foreside's clients to Healthy Mind throughout January and February 2026. To this end, on or around January 19, 2026, Snow sent a form to Foreside's clients advising them to transition their care from Foreside to Healthy Mind. [128-49]. Five percent of Foreside's clients did so.[24] [161] at 7. He also offered a five percent discount to a Foreside client if they agreed to stay with Healthy Mind. [128-57]. On January 28, 2026, Snow emailed a school district client noting that "[a]ll our current patients and contracts are being transferred" to Healthy Mind. [128-51].

---

[24] That only five percent signed the form does not shift the analysis, the issue is whether Snow violated the Preliminary Injunction, not his degree of success. The same goes for Defendants' argument that Healthy Mind ultimately decided not to accept Foreside clients. [163] at 12. Also, it is worth noting that Snow now contradicts his earlier testimony that he did not refer a single Foreside client to another provider. [128-13] at 246:11–23, 248:11–250:14, 255:3–258:20.

Snow argues that he subjectively believed his conduct was permissible because he was transitioning Foreside's patients to *another* home care provider, not Foreside. But "a party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable." *Taggart*, 587 U.S. at 561; *United States v. Monteleone*, 804 F.2d 1004, 1010–1011 (7th Cir. 1986) (a party's own evaluation or interpretation of a court order does not excuse them from contempt liability when the order is clear and unambiguous). As already noted, the Court prohibited Defendants (and their agents) from participating in transitioning Foreside's clients and gave the Receiver the sole authority to do so. Even if, for the sake of argument, the Preliminary Injunction and the Receiver Order were vague, the Court repeatedly reminded Defendants of this obligation, including on January 6, 2026—preceding much of this conduct. [74]; [80]; [90]; [91]; [94]. And the Receiver emailed Snow on January 29, 2026 to advise him that no Foreside employee could endorse, mention, assist, or encourage clients to transfer to Healthy Mind or any other provider. [175-9] at 2. Despite this warning Snow continued to do just that. Given the clarity of these orders, Snow's supposed belief was objectively unreasonable, and was willful and contemptuous.

**iii. Bright Horizons**

In addition to attempting to transfer Foreside clients to Foreside Corp. and Healthy Mind, Defendants also attempted to obtain new clients through Bright Horizons, a staffing agency and one of BrightStar's National Account clients. After being informed that Bright Horizons could not do business with Foreside due to the

Preliminary Injunction, on January 9, 2026, Mr. Woodsum called Bright Horizons to say that he was forming a new entity not subject to the order and that he wanted Bright Horizons to refer clients to it. [128-26] at ¶¶ 13, 24; *id.* at 13.

Defendants respond that Mr. Woodsum's communications with Bright Horizons did not violate the Preliminary Injunction because he communicated with Bright Horizons directly, not with any of Bright Horizons' customers. [163] at 19–20. Again, the Preliminary Injunction Order unambiguously forbids soliciting business from any of BrightStar's referral sources even if business is not solicited from the sources' clients directly. [52] at ¶ B (forbidding Defendants from "soliciting business from . . . any of BrightStar's referral sources (*including without limitation National Accounts*")) (emphasis added). Defendants also argue that Mr. Woodsum's solicitations from Bright Horizons were not for any "competitive business purpose" because he intended to refer Bright Horizons to Healthy Mind for "altruistic" purposes. [163] at 20. This barely deserves a response given Defendants' and their agents' repeated representations to third parties that Healthy Mind was under their control. *E.g.*, [128-13] at 202:10–25; [128-41] at 2 (referring to Healthy Mind as a "new Foreside subsidiary"). Assuming for the sake of argument that this is true, Defendants assume that contact with Bright Horizons could only be a competitive business purpose if its purpose was to benefit the Woodsums or Foreside, but this argument conveniently omits the fact that the Preliminary Injunction Order forbids Defendants from soliciting business from National Accounts "for themselves, *or* . . . on behalf of . . . *any person or entity*." [52] at ¶ B (emphasis added). Any activity by

Defendants to draw clients away from BrightStar constitutes a competitive purpose. The Preliminary Injunction Order leaves room for no other interpretations. This violation was willful and contemptuous.

### E. Mrs. Woodsum's Employment

In support of Foreside's motion to dismiss and opposition to BrightStar's motion for a preliminary injunction, Mr. Woodsum submitted declarations stating that Mrs. Woodsum retired from Foreside on January 1, 2025, and had not had any role with or received compensation from Foreside in 2025 or after the expiration of the franchise agreements. [30-2] at ¶ 8; [32-1] at ¶ 7. Mrs. Woodsum also filed a declaration stating that she was "no longer an active employee with Foreside Management Company" at any time in 2025. [30-4] at ¶ 3. Plaintiff posits that these statements are contradicted by emails to, from, and copying Mrs. Woodsum regarding official Foreside business during the time period after Defendants claim she left Foreside. *See e.g.*, [128-60].

Defendants concede that Mrs. Woodsum filled in for Foreside personnel on occasion and kept tabs on certain VIP clients throughout 2025, but aver that while Mrs. Woodsum continued to own a share of Foreside, this activity does not necessarily mean that she was an "employee" in a legal sense as she was not compensated for her services, did not have any consistent daily duties, and did not hold any formal title at Foreside. [163] at 31–32. Neither party puts forth a substantive argument as to whether Mrs. Woodsum's activities qualify her as an employee. Due to the ambiguity regarding Mrs. Woodsum's employment status and the effect of Mrs. Woodsum's

continued activities there, the Court does not find that Mr. and Mrs. Woodsum perjured themselves in stating that Mrs. Woodsum no longer worked at Foreside as of January 1, 2025.

## III. Sanctions Award As to Defendants

As outlined above, the Court holds Defendants in contempt for the following conduct:

- Mr. Woodsum and Foreside Management Co.'s failure to immediately turn over to BrightStar a complete list of Foreside's clients and Foreside's business phone numbers between November 20 and December 18, 2025;
- Mr. Woodsum and Foreside Management Co.'s failure to generate and transmit a complete client list between December 19, 2025 and February 10, 2026;
- Mr. Woodsum, Foreside Management Co., and Mrs. Woodsum's Cover Letter sent to Foreside's clients on November 24, 2025;
- Mr. Woodsum and Foreside Management Co.'s failure to promptly grant the Receiver access to the accounts and vendors necessary for him to perform his duties;
- Mr. Woodsum and Foreside Management Co.'s transfer of $25,000 from Foreside's Wells Fargo account;
- Mr. Woodsum and Foreside Management Co.'s attempts to transfer Foreside's clients to Foreside Corp. and Healthy Mind;
- Mr. Woodsum's solicitation of referrals from Bright Horizons; and

- Mr. Woodsum and Foreside Management Co.'s consultation with and control over Healthy Mind.

Due to this repeated fraud on the Court, perjury, and months-long conspiracy to evade the Court's orders, BrightStar seeks severe monetary sanctions against all three of the Defendants in the form of its fees and costs, a daily fine, and disgorgement of Defendants' profits, as well as a referral to the U.S. Attorney's Office for prosecution for perjury. [127] at 31–34. In determining the sanctions warranted for this misconduct, the Court considers: (1) the harm resulting from the contemnors' noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the contemnors' willfulness in disregarding the Court's orders. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1946).

**A. Fees & Costs**

Plaintiff seeks the attorneys' fees and costs incurred in connection with its efforts to enforce the Preliminary Injunction Order since November 20, 2025. Attorneys' fees and costs are an appropriate remedy for contempt. *Connolly v. J.T. Ventures*, 851 F.2d 930, 935–37 (7th Cir. 1988) (affirming fee award); *S. Suburban Hous. Ctr. v. Berry*, 186 F.3d 851, 855 (7th Cir. 1999) (in a civil contempt proceeding, the district court may award a party the attorneys' fees and expenses it incurred in bringing the violation to the court's attention); *C & N Corp. v. Kane*, 142 F. Supp. 3d 783, 792 (E.D. Wis. 2015). ("An award of reasonable attorneys' fees is entirely warranted because [plaintiff] had to bring the motions it did to obtain relief.").

The Court awards Plaintiff's requested fees and costs incurred in bringing Defendants into compliance with the Preliminary Injunction and Receiver Order. The Court finds that this period spans November 20, 2025 through June 29, 2026, the date of the Receiver's final report and petition for discharge. [178]. Should the Court become aware of any further noncompliance by Defendants or any of their agents, the Court may extend the fee period. Within sixty days of this order Plaintiff is to file a motion outlining the fees and costs incurred in this matter from November 20, 2025 to June 29, 2026.[25] The parties are to follow the processes outlined in Local Rules 54.1 and 54.3.

### B. Disgorgement

Plaintiff requests disgorgement of Defendants' gross revenue, whether generated by Foreside Management Company d/b/a Foreside Home Care & Nursing or Healthy Mind Home Care, Inc. d/b/a Foreside Home Care & Nursing since November 20, 2025—the day after the Preliminary Injunction entered. Disgorgement is appropriate where the "'entire profit of a business or undertaking' results from the wrongdoing." *S.E.C. v. New*, 2021 WL 4451896, at *2 (S.D. Ind. Sept. 29, 2021) (quoting *Root v. Lake Shore & M.S. Ry. Co.*, 105 U.S. 189, 203 (1881)). Courts routinely award disgorgement due to a party's repeated violation of an injunction.

[25] As stated *infra*, Snow is responsible for the attorneys' fees and costs incurred in bringing Defendant's Motion for Rule to Show Cause ([132], [176]) which are attributable to his conduct. Defendants are responsible for paying the fees and costs associated with the remaining proportions of Plaintiff's Motion for Rule to Show Cause, as well as all additional fees incurred in bringing Defendants into compliance.

*E.g.*, *Connolly v. J.T. Ventures*, 851 F.2d 930, 932 (7th Cir. 1988) (award of contemnor's profits is an appropriate remedy for contempt); *Nav-Aids, Ltd. v. Nav-Ads USA, Inc.*, 2002 WL 773763, at *3 (N.D. Ill. Apr. 26, 2002) (award of contemnor's profits is appropriate where defendant violated injunction even though "this amount may not exactly reflect [the injured party]'s lost sales"); *C & N Corp.*, 142 F. Supp. 3d at 792 ("[D]isgorging "all profits from sales occurring in violation of the terms of the injunction is [] appropriate.").

Plaintiff argues disgorgement is appropriate because the premise of the Court's orders was to secure for BrightStar the benefits of the terms of the franchise agreements so that it could reestablish a position in the marketplace and begin addressing the competitive disadvantage resulting from Defendants' breaches. Defendants do not address disgorgement in opposition to Plaintiff's motion, so any argument is waived.

Plaintiff's request for disgorgement is granted in part. Defendant Foreside, as well as Foreside Management Company d/b/a Foreside Home Care & Nursing, are ordered to disgorge to Plaintiff all gross revenue incurred by their home health care businesses between November 20, 2025 and the present. Furthermore, Mr. and Mrs. Woodsum are ordered to disgorge any income or compensation they personally received as a result of their provision of home health care services throughout the same time period. Given that Plaintiff has not pursued its Motion for Rule to Show Cause with respect to non-parties Liu and Healthy Mind, that Healthy Mind ultimately refused to receive any of Foreside's clients, and the record demonstrating

that Liu was not a willful accomplice to Defendants' scheme, the Court will not order disgorgement of Healthy Mind's gross revenue. If Plaintiff requires limited discovery into Defendants' revenue, it should raise it with the Court.

**C. Daily Fine**

Plaintiff requests the Court institute a daily fine payable to BrightStar in the amount of no less than $25,000 per day, starting on November 20, 2025, and continuing each day until the Court and Receiver confirm Defendants' compliance with the Preliminary Injunction and Receiver Order—June 29, 2026. [178]. Based on the Court's calculation, Plaintiff requests $5,525,000 incurred over the 221 days between November 20, 2025 and June 29, 2026.

A daily fine may be an appropriate sanction for a franchisee's repeat failure to comply with a preliminary injunction order. *Pearle Vision, Inc.*, 2007 WL 1752596, at *5 (awarding $321,000 in sanctions against franchisee based on a daily fine for each day the franchisee failed to comply with court order to turn over patient records); *see also JTH Tax, Inc. v. Lee*, 540 F. Supp. 2d 642, 648–49 (E.D. Va. 2007) (imposing a $500 daily fine for former franchisee's failure to comply with preliminary injunction order).

Defendant does not counter Plaintiff's request for a daily fine, but the Court must ensure the amount awarded is reasonable considering Defendants' financial resources and the burden the sanction may impose, compared against the harm caused by Defendants' noncompliance, the effectiveness of such a sanction, and the Defendants' willfulness in violation the Court's orders. As discussed at length,

Defendants' blatant misconduct was intended to circumvent the letter and purpose of the Court's orders and was demonstrably willful. Defendants remain unrepentant. Therefore, the Court is of the mind that only a substantial monetary penalty will effectively deter Defendants from repeating this misconduct. Plaintiff has demonstrated that Defendants have the ability to pay the requested sanction—Foreside grossed approximately $13 million in 2025, an average of $35,000 per day—so Plaintiff's proposed sanction amounts to a $10,000 a day discount. [128-1] at 63:17–64:1. However, the Court also awards disgorgement of Defendants' profits for this same period. The Court thus reduces the fine to $15,000 per day, a total of $3,315,000.

Plaintiff's request for a daily fine is granted in part. Within fourteen days of this order Defendants are to pay to BrightStar the $3,315,000 awarded. Should further instances of noncompliance come to the Court's attention, the Court retains the discretion to extend the daily fine to the present.

### D. Perjury Referral

Plaintiff requests the Court refer Mr. and Mrs. Woodsum to the United States Attorney's Office for possible prosecution for perjury for lying under oath and submitting fraudulent declarations to the Court. This request is granted in part.

False testimony is an "intolerable" and "flagrant affront to the truth-seeking function of adversary proceedings" and courts should neither condone nor tolerate it. *Dotson v. Bravo*, 202 F.R.D. 559, 570 (N.D. Ill. 2001); (quoting *ABF Freight System, Inc. v. Nat'l Labor Rels. Bd.*, 510 U.S. 317, 323 (1994)). "In determining appropriate sanctions for lying under oath and other improper activity in litigation, courts have

considered the degree of willfulness or the intentional nature of the conduct, and the extent to which there is a pattern of misconduct." *Fid. Nat'l Title Ins. Co. of N.Y. v. Intercountry Nat'l Title Ins. Co.*, 2002 WL 377728, at *17 (N.D. Ill. Mar. 8, 2002) (referring party to U.S. Attorney's Office for witness tampering). Referral to the U.S. Attorney's Office is "appropriate based on a litigant's flouting of his duty to be honest with the court." *Arma Yates, LLC v. Arma Care Ctr., LLC*, 2018 WL 2193141, at *4 (N.D. Ill. May 14, 2018); *Brown & Brown, Inc. v. Ali*, 592 F. Supp. 2d 1009, 1051 (N.D. Ill. 2009) (referral to U.S. Attorney's Office for prosecution for perjury); *Neal v. LaRiva*, 765 F.3d 788, 791 (7th Cir. 2014) (same).

As previously outlined, the Court finds Mr. Woodsum lied to the Court on the following occasions:

- Mr. Woodsum's December 18 testimony that he did not direct Burrell to draft the Cover Letter;
- Mr. Woodsum's December 18 testimony that he did not know about the Cover Letter before it was sent out;
- Mr. Woodsum's December 18 testimony that he had not seen the Cover Letter prior to the December 18 hearing;
- Mr. Woodsum's December 18 testimony that he did not know if a new entity would be established in Foreside's place or do business as "Foreside Home Care & Nursing"; and
- Mr. Woodsum's December 18 testimony that Foreside would be closed and he would be unemployed the following day.

Defendants argue that while a court has authority to initiate a prosecution for criminal contempt, its exercise of that authority must be restrained by the principle that only the least possible power adequate to the end the proposed contemptuous conduct should be used in contempt cases. [163] at 14 (citing *Young v. United States*, 481 U.S. 787, 801 (1987)). True enough. However, Plaintiff does not ask the Court to make a criminal contempt finding—merely to refer the matter to the Department of Justice to independently assess whether criminal perjury charges against Mr. Woodsum are warranted. [174] at 17. "[T]he law's insistence that participants in judicial proceedings must be truthful" is "uncompromising," *Mullins v. Hallmark Data Sys., LLC*, 511 F. Supp. 2d 928, 931 (N.D. Ill. 2007), in order to maintain the "entire civil justice system." *Dotson*, 202 F.R.D. at 573. Mr. Woodsum has shown a repeated and blatant disregard for this Court's orders, as demonstrated by the numerous civil contempt findings *supra*. Therefore, a perjury referral of Mr. Woodsum is necessary to deter future misconduct and "preserve the integrity of the judicial process." *United States v. Zizzo*, 120 F.3d 1338 (7th Cir. 1997) (citing Fed. R. Evid. 603); *see also Negrete v. Nat'l R.R. Passenger Corp.*, 547 F.3d 721, 722 (7th Cir. 2008) ("[B]ecause it appears that Negrete may have committed perjury, we refer this opinion to the United States Attorney."); *Brown & Brown*, 592 F. Supp. 2d at 1049–50 (finding defendant in contempt for giving false testimony under oath and violating the terms of a preliminary injunction enjoining violation of non-solicitation obligations and referring defendant to U.S. attorney for possible perjury). Therefore, the Court directs the Clerk of Court to forward a copy of this Order, along with the

transcript dated December 18, 2025 to the United States Attorney's Office for the Northern District of Illinois for evaluation of potential perjury charges against Mr. Woodsum under 18 U.S.C. § 1621.

Plaintiff also requests the Court refer Mrs. Woodsum to the U.S. Attorney's Office due to her August 29, 2025 declaration stating that she had retired and was "no longer an active employee with Foreside Management Company" at any time in 2025.[26] [30-4] at ¶ 3. As stated, the Court does not find that Mrs. Woodsum perjured herself in this regard. For the sake of argument, even if she had, this single paragraph in Mrs. Woodsum's sole declaration in this case is the only misstatement alleged on behalf of Mrs. Woodsum. In contrast to Mr. Woodsum's repeat false statements, this does not rise to the level necessary for referral for possible prosecution.

## IV. Sanctions Award as to Non-Party Snow

Plaintiff moves for rule to show cause why non-party Snow should not be held in contempt of Court for aiding and abetting Defendants' repeated violations of the Preliminary Injunction and the Receiver Order. [132]. Plaintiff asks that Snow be held in contempt and enjoined from violating the terms of the Preliminary Injunction, ordered to pay monetary sanctions sufficient to compel compliance, and reimburse BrightStar for the attorneys' fees incurred in preparing its motion.

---

[26] Plaintiff also seeks a referral for Mr. Woodsum based on his August 29, 2025 declaration stating that Mrs. Woodsum "has had no role with Foreside at any time in 2025 nor after the expiration of the Franchise Agreements." [30-2] at ¶ 8. The Court leaves the scope of the review of Mr. Woodsum's conduct to the discretion of the United States Attorney's Office.

The Preliminary Injunction is binding on the parties to the action as well as their "officers, agents, servants, employees, and attorneys." *Reich v. Sea Sprite Boat Co.*, 50 F.3d 413, 417 (7th Cir. 1995) (quoting Fed. R. Civ. P. 65(d)). Snow properly does not contest the Court's jurisdiction over him. "Jurisdiction over persons who knowingly violate a court's injunctive order, even those without any other contact with the forum, is necessary to the proper enforcement and supervision of a court's injunctive authority and offends no precept of due process." *S.E.C. v. Homa*, 514 F.3d 661, 675 (7th Cir. 2008); *see also Empire Indus., Inc. v. Winslyn Indus., LLC*, 2019 WL 339544, at *4 (N.D. Ill. Jan. 28, 2019) (the court has jurisdiction over a non-resident defendant to consider whether the defendant aided the violation of the preliminary injunction). The Court has jurisdiction over Snow because as an officer of Foreside he repeatedly and knowingly violated the Preliminary Injunction Order and Receiver Order, and willfully aided and abetted Defendants' efforts to do the same. There is no doubt that Snow was on notice of the Preliminary Injunction Order and its requirements. [133-1] at 2.

As outlined at length above, the Court holds Snow in contempt for:

- Simultaneously serving as Foreside's CFO and Healthy Mind's general manager;
- Facilitating Defendants' involvement with, and control over Healthy Mind; and
- Facilitating and attempting to facilitate Defendants' transfer of Foreside clients to Healthy Mind.

Plaintiff requests that Snow pay the fees and costs associated with bringing its motion. Plaintiff's request is granted in part. Because Plaintiff also initially moved for sanctions against third-parties Liu and Healthy Mind, the Court orders Snow to pay the fees and costs of bringing Plaintiff's Motion for Rule to Show Cause ([132], [176]) which are associated with his conduct. For the sake of clarity, Defendants are responsible for the remaining fees and costs associated with that motion, ([132], [176]), as well as all other fees and costs incurred between November 20, 2025 through June 29, 2026 to bring Defendants into compliance with the Preliminary Injunction. *Supra* Section III.A. Within sixty days of this order Plaintiff is to file a motion outlining the fees and costs incurred in bringing its Motion for Rule to Show Cause against Snow. Plaintiff and Snow are to follow the processes outlined in Local Rules 54.1 and 54.3.

Given Snow's willful and repeated defiance of the Court's orders and unwillingness to candidly engage with Court and Plaintiff, the Court also awards monetary sanctions against Snow in the amount of $10,000, to be paid to Plaintiff within fourteen days of this order.

## CONCLUSION

For the stated reasons, Plaintiff's motions for sanctions [124] and rule to show cause [132] are granted in part. With respect to Defendants, the Court awards Plaintiff its attorneys' fees and costs and a daily fine in the amount of $15,000 incurred each day from November 20, 2025 to June 29, 2026, and disgorgement of Defendants' gross revenue and income between November 20, 2025 and the present.

The Court also directs the Clerk of Court to forward a copy of this Order, along with the transcript dated December 18, 2025, to the United States Attorney's Office for the Northern District of Illinois for evaluation of potential perjury charges against Defendant Mr. Woodsum under 18 U.S.C. § 1621. With respect to Snow, the Court awards Plaintiff its attorneys' fees and costs associated with bringing its Motion for Rule to Show Cause ([132], [176]) against Snow, and a fine of $10,000.

Defendants and Snow are ordered to transmit the fine amounts to Plaintiff within fourteen days of this order. Within sixty days of this order, Plaintiff is to file a bill of costs calculating the total fees and costs requested from Defendants and Snow, and the amount of Defendants' gross revenue and income subject to disgorgement.

E N T E R:

Dated: November 10, 2026

Mary M Rowland

MARY M. ROWLAND
United States District Judge